# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| GIULIA CARPONI, derivatively on behalf of GRAFTECH INTERNATIONAL LTD., | Case No.: 1:25-cv-01216 |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| DAVID RINTOUL, QUINN COBURN, MARCEL KESSLER, TIMOTHY K. FLANAGAN, JEREMY S. HALFORD, HENRY E. KEIZER, MICHEL J. DUMAS, DEBRA FINE, JEAN-MARC GERMAIN, ANTHONY TACCONE, BCP IV GRAFTECH HOLDINGS LP., BROOKFIELD CAPITAL PARTNERS LTD., and BROOKFIELD ASSET MANAGEMENT LTD | |
| Defendants, | |
| and | |
| GRAFTECH INTERNATIONAL LTD., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Ms. Giulia Carponi, ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant GrafTech International, Ltd. ("GrafTech" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants David Rintoul ("Rintoul"), Quinn Coburn ("Coburn"), Marcel Kessler ("Kessler"), Timothy K. Flanagan ("Flanagan"), Jeremy S. Halford ("Halford"), Henry E. Keizer ("Keizer"), Michel J. Dumas ("Dumas"), Debra Fine ("Fine"), Jean-Marc Germain ("Germain"), and Anthony Taccone ("Taccone"), herein

referred to collectively as the "Individual Defendants," and BCP IV GrafTech Holdings LP ("BCP Holdings"), Brookfield Capital Partner Ltd. ("BCP Capital"), Brookfield Asset Management Inc. ("BCP Asset Management") (collectively, the "Brookfield Defendants," and together with the Individual Defendants and GrafTech, the "Defendants") for breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Rintoul, Coburn, Kessler, Flanagan, Halford, BCP Holdings, BCP Capital, and BCP Asset Management. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GrafTech, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants and The Brookfield Defendants—controlling shareholders of GrafTech—from February 8, 2019 through August 3, 2023, inclusive (the "Relevant Period").

2

2.      Founded in 1886 in Delaware, GrafTech is a worldwide manufacturer of graphite electrode products used by the Company's customers to produce electric arc furnace ("EAF") steel products, a supposedly environmentally friendlier alternative to traditional blast furnace steel production. GrafTech's electrodes must be affixed with a "connecting pin" in order to work, thereby making the "pin stock" from which such devices are machined critical to the Company's manufacturing process. Today, GrafTech has graphite electrode manufacturing facilities in (1) Monterrey, Mexico ("Monterrey," or the "Monterrey Facility"); (2) Pamplona, Spain ("Pamplona"); (3) Calais, France ("Calais"); and (4) St. Marys, Pennsylvania ("St. Marys"). The Company also owns a facility in Port Lavaca, Texas ("Seadrift"), (which it claims, in its annual report on Form 10-K for 2024, filed with the SEC on February 14, 2025 (the "2024 Form 10-K"), to have idled in 2024). At all relevant times, GrafTech produced 100% of the pin stock utilized for its electrodes at the Monterrey Facility.

3.      For decades, GrafTech had blatantly and flagrantly disregarded local environmental regulations at the Monterrey Facility, chronically polluting the neighborhoods in that facility's vicinity with harmful dust and other industrial emissions. By the start of the Relevant Period, this had resulted in repeated warnings from local authorities. These warnings have ultimately proven ineffective at curbing GrafTech's disregard for the health and environmental integrity of the Monterrey Facility's neighboring communities.

4.      Despite this, throughout the Relevant Period, Defendants repeatedly boasted to investors simultaneously of the Company's, *inter alia*: (1) competitive advantages, attributing these largely to its "low-cost" manufacturing plants; and (2) the Company's purportedly "proactive" commitment to environmental regulation compliance through reduction of its environmental impacts. The reality, however, was that the Company's cost leadership was

3

achieved substantially through the Company's failure to adhere to its ostensibly "rigorous internal environmental protection standards" at the Monterrey Facility.

5.     In March 2019, the Department of Sustainable Development of the State of Nuevo León (the "Department of Sustainable Development") began administrative proceedings against the Company over its continued failure to control the dust emissions generated by its manufacturing operations (the "2019 Administrative Proceedings"). These proceedings resulted in findings that: (1) GrafTech's Monterrey Facility was operating "***without the means to ensure that dust emissions are avoided***, which is mandatory as established in Article 131 section II of the Environmental Law of the State of Nuevo León, to ensure satisfactory air quality for population well-being and ecological balance;"[1] and (2) GrafTech "***benefitted economically by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere*** during its operation." The proceedings further resulted in an order that GrafTech "***immediately and permanently*** . . . carry out the necessary actions, adaptations and/or maneuvers that ***guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere***." The proceedings also resulted in GrafTech agreeing to invest over $2 million in dust collection and containment projects to cure its violations of local law.

6.     Defendants disclosed the administrative proceeding in GrafTech's SEC filings but concealed the full extent and severity of the Company's misconduct by misleadingly characterizing the proceeding as involving "***potential*** violations of state environmental law" and reporting that the Company had paid "certain fines that were not material to the Company." The Defendants did not disclose GrafTech's agreement to invest over $2 million in dust collection and

---

[1] All emphasis added unless otherwise indicated.

4

containment or the order requiring it to immediately and permanently remedy its dust emission controls.

7.    GrafTech continued to tout its environmental commitments and regulatory compliance while simultaneously failing to comply with the order and shortly resuming its decades-long pattern of failing to follow through on its commitments to remedy the Monterrey Facility's environmental safeguards. GrafTech did so despite knowing that its actions exposed them to known material risks of government enforcement action and consequent disruption to its business activity at the Monterrey Facility. Despite Defendants' false and/or misleading statements to their investors, according to the mayor of the local municipality Apodaca, César Garza Villareal ("Garza"), for over thirty years, GrafTech had repeatedly signed agreements to remedy their ineffective environmental controls by continually allowing graphite dust to pollute the air of and settle on the individuals and property of neighboring communities, and then failed to take any action required by those agreements. Indeed, during the Relevant Period, GrafTech continued to pledge updates to its environmental controls without following through until the Monterrey Facility was shut down by governmental order (in sum, the "Dust Emissions Misconduct"). Indeed, its flagrant refusal to comply led to numerous complaints, including one by Garza.

8.    The Company's knowledge of these failures is clear, given the Company's long history of disputes with local authorities regarding the Monterrey Facility's environmental impacts; the 2019 Administrative Proceedings, which the Company noted in its SEC filings; and Defendants' repeated representations of their active involvement in and leadership of the Company's environmental management initiatives and systems. Further, involvement in these initiatives provided Defendants with monthly environmental reports from site managers, as well as weekly communications concerning "observations from site walk-throughs."

5

9.      Defendants also continued to mislead investors over the course of four earnings calls beginning August 6, 2021, during which Defendants represented to investors that the Company had "***de[-]risk[ed its] pin production capacity***" by opening a "***pin production line***" at the St. Marys Facility. Defendants represented that the St. Marys Facility was "***operational***" by November 5, 2021, which would have meant, were these representations truthful, that the Company had two pin production facilities. However, the St. Marys Facility was not actively involved in any pin production or pin stock production at the time—nor was it at any time during the Relevant Period. Rather, as confirmed by admissions of a former GrafTech employees and Defendants themselves, the Company had not even begun obtaining the appropriate operating permits for pin production at St. Marys, leaving the Monterrey Facility the Company's only site capable of producing the pin stock that the Company's electrodes depend upon.

10.     Consequently, though Defendants represented to investors that they had "de-risk[ed]" the Company's pin production, the Company was in fact quite vulnerable to significant commercial harm risks were the Monterrey Facility's operations disrupted. This is precisely what would happen.

11.     On September 16, 2022, the truth began to emerge when Defendants announced that the Monterrey Facility had been shut down following an inspection by Mexican regulators. That same day, Mayor Garza publicly celebrated this shutdown and noted that it followed a request from the Apodaca City Council seeking such regulators' help in closing the Monterrey Facility because of its long history of noncompliance with local environmental laws and regulations.

12.     On this news, the price per share of GrafTech's common stock fell by $0.45 per share, approximately 8.5%,, from a closing price of $5.30 per share on September 16, 2022, to close at $4.85 per share the following trading day, September 19, 2022. However, the price of the

Company's common stock remained artificially inflated at this time, as Defendants continued to conceal the truth: the Company was entirely dependent on the Monterrey Facility for all its pin stock. The Defendants also continued to conceal other material information regarding the financial impact of the closure of the Monterrey Facility.

13.     On this news, the price per share of the Company's common stock plummeted $1.18 per share, approximately 22.6%, from a closing price of $5.23 per share on August 3, 2023, to close at $4.05 per share on August 4, 2023. This constituted a total decline of over 73% from its Relevant Period high of $15.35 per share.

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements, including, *inter alia*, that: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; (2) the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (5) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15.     In further breach of their fiduciary duties, during the Relevant Period the Individual Defendants and The Brookfield Defendants caused GrafTech to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between August 2019 and June 2022, approximately 34.7 million shares of GrafTech common stock were repurchased, costing the Company **over $400.9 million**. As the Company's stock was actually worth only $4.05 per share, the price at which it was trading when markets closed on August 4, 2023, the Company overpaid for repurchases of its own stock **by over $260.4 million** in total.

16.     Moreover, three of the Individual Defendants and the Defendant BCP Holdings breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining combined proceeds of over $1.5 billion.

17.     The Company has been substantially damaged as a result of the Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and participated in and/or facilitated the Company's participation in the Dust Emissions Misconduct.

19.     In light of the Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and President, former Vice President ("VP") of Finance, former Treasurer, former Interim CEO, Chief Operations Officer ("COO") and Executive VP, to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Ohio (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, the need to remedy the Dust Emissions Misconduct, losses from the waste of corporate assets, and

losses due to the unjust enrichment of the Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, of the collective engagement in and/or facilitation of the Company's engagement in the Dust Emissions Misconduct, of the substantial likelihood of the directors' liability in this derivative action, and of the current and former executive officers' and the Company's liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of GrafTech. Plaintiff has continuously held GrafTech common stock at all relevant times.

### Nominal Defendant GrafTech

26.     GrafTech is a Delaware corporation with its principal executive offices at 982 Keynote Circle, Brooklyn Heights, Ohio 44131. GrafTech's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "EAF."

### Defendant Rintoul

27.     Defendant Rintoul served as the Company's CEO and President from March 2018 until June 2022. Additionally, during that same period, Defendant Rintoul served as a Company director.

28.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Rintoul made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| March 21, 2020 | 4,049 | $6.16 | $24,941.84 |
| February 25, 2021 | 4,731 | $12.09 | $57,197.79 |
| March 21, 2021 | 4,195 | $11.83 | $49,626.85 |
| May 27, 2021 | 91,409 | $13.16 | $1,202,942.44 |
| November 8, 2021 | 45,750 | $12.86 | $588,129.98 |

Thus, in total and before the fraud was exposed, Defendant Rintoul sold 150,134 shares of Company common stock on inside information, for which he received approximately $1,922,839

in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions complained of herein were exposed, demonstrate his motive in facilitating and participating in the scheme.

29.     The Schedule 14A the Company filed with the SEC on April 7, 2022 (the "2022 Proxy Statement"), stated the following about Defendant Rintoul:

> Mr. Rintoul became Chief Executive Officer and President and was elected to the Board in March 2018. Prior to joining the Company, Mr. Rintoul served as President of U.S. Steel Tubular Products, a fully-integrated tubular products manufacturer, and as a Senior Vice President of United States Steel Corporation, an integrated steel producer, since 2014. Before that, Mr. Rintoul has served in various roles at U.S. Steel since 2007, including oversight of U.S. Steel's Slovak and Serbian operations. Mr. Rintoul's career in the steel industry spans 39 years with positions at both integrated and mini mill producers in the United States, Europe and Canada, including extensive minimill operational experience at North Star Bluescope Steel in Delta, Ohio from 2001 to 2005 and from construction through full operations at Acme Steel Company in Riverdale, Illinois from 1995 to 2001. Mr. Rintoul holds an Associate's degree in Mechanical Engineering Technology from Sault College of Applied Arts and Technology, a Bachelor's degree in Business Administration from Lake Superior State University and a Master's degree in Business Administration from the University of Notre Dame. Mr. Rintoul is qualified to serve on the Board primarily as a result of his insights from his experience as GrafTech's current Chief Executive Officer and President and his ability to provide guidance, operational knowledge and management perspective to the Board.

**Defendant Coburn**

30.     Defendant Coburn served as the Company's VP of Finance, Treasurer, and CFO from September 29, 2015, until November 29, 2021. Previously, Defendant Coburn served as the Company's VP of Finance and Treasurer from 2010 until 2015. Following his resignation, the Company retained Defendant Coburn as a Senior VP in an advisory role to assist the transition of Defendant Flanagan to the role of CEO until May 21, 2022.

**Defendant Kessler**

31.     Defendant Kessler served as a Company director from June 27, 2022, until

December 31, 2024. Defendant Kessler also previously served as the Company's CEO from June 27, 2022 until November 15, 2023.

32.    The Schedule 14A that the Company filed with the SEC on April 2, 2024 (the "2024 Proxy Statement") stated the following about Defendant Kessler:

> Mr. Kessler was elected to the Board in July 2022. Mr. Kessler served as our Chief Executive Officer and President from July 2022 to November 2023. Prior to joining the Company, Mr. Kessler previously served as the President and Chief Executive Officer of Pason Systems Inc. (TSX: PSI) ("Pason"), a global provider of specialized data management systems for oil and gas drilling, from 2011 to 2020, and has been a director of Pason since 2012 and is currently serving as the Chairman of the Board of Directors of Pason. Before joining Pason in 2011, Mr. Kessler was President and Chief Executive Officer of CCR Technologies, a provider of solvent reclaiming services, and was a Partner at McKinsey & Company, a management consulting firm. Mr. Kessler holds a master's degree in Engineering with Distinction from the Swiss Federal Institute of Technology and a master's degree in Finance from the London Business School. Mr. Kessler is qualified to serve on the Board primarily as a result of his experience as GrafTech's former Chief Executive Officer and President and his ability to provide strategic guidance, operational knowledge, and management perspective to the Board.

**Defendant Flanagan**

33.    Defendant Flanagan has served as the Company's current CEO and President and a Company director since March 26, 2024. Previously, Defendant Flanagan served as the Company's Interim CEO and President from November 2023 until March 2024 and prior to that as the Company's CFO, Senior VP of Finance, and Treasurer from 2021 until November 2023.

34.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Flanagan made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 25, 2023 | 3,717 | $5.60 | $20,815.20 |

Thus, in total and before the fraud was exposed, Defendant Flanagan sold 3,717 shares of Company common stock on inside information, for which he received approximately $20,815 in proceeds.

His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

35.     The Schedule 14A that the Company filed with the SEC on April 3, 2025 (the "2025 Proxy Statement") stated the following about Defendant Flanagan:

> Mr. Flanagan was elected to the Board in March 2024 when he was appointed as GrafTech's Chief Executive Officer and President. Prior to that, Mr. Flanagan served as GrafTech's Interim Chief Executive Officer and President from November 2023 to March 2024. He joined the Company in November 2021, upon being appointed GrafTech's Chief Financial Officer, Vice President Finance and Treasurer. Mr. Flanagan previously served as Executive Vice President, Chief Financial Officer of Cleveland-Cliffs Inc., a flat-rolled steel producer and supplier of iron ore pellets, from January 2017 to February 2019. Prior to being promoted to Executive Vice President, Chief Financial Officer of Cleveland-Cliffs, he held a variety of financial leadership roles at Cleveland-Cliffs since joining in 2008. More recently, he served as Chief Financial Officer of Benesch, Friedlander, Coplan & Aronoff, LLP, an AmLaw 200 law firm, from June 2019 to November 2021. Mr. Flanagan is qualified to serve on the Board primarily as a result of his insights from his experience as GrafTech's Chief Executive Officer and President and his ability to provide guidance, operational knowledge, and management perspective to the Board.

**Defendant Halford**

36.     Defendant Halford has served as the Company's Executive Vice President ("EVP") and COO since 2021. Previously, Defendant Halford served the Company as its Senior VP, Operations and Development from 2019 until 2021.

37.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Halford made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 1, 2020 | 3,717 | $7.97 | $24,970.01 |
| May 1, 2021 | 4,451 | $12.72 | $57,761.52 |
| May 27, 2021 | 44,216 | $13.16 | $581,882.56 |
| February 25, 2023 | 3,922 | $5.60 | $21,963.20 |

Thus, in total before the fraud was exposed, he sold 55,812 shares of Company common stock on inside information, for which he received approximately $686,577 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

38.     The Company's website states the following with respect to Defendant Halford:

Jeremy S. Halford was promoted to Executive Vice President, Chief Operating Officer in 2021 and previously served as Senior Vice President, Operations and Development since joining GrafTech in 2019. Prior to GrafTech, Mr. Halford served as the President of Arconic Engineered Structures, a producer of highly engineered titanium and aluminum components for the aerospace, defense and oil and gas markets, apposition he held since January 2017. Mr. Halford also was President of Doncasters Aerospace, a manufacturer of components and assemblies for the civil and military aero engine and airframe markets, from 2014 to 2016, and Vice President, Global Business Development, Doncasters Group Limited from 2013 to 2014. Previously, he also was President of Mayfran International from 2012, to 2013, and spent seven years at Alcoa in a variety of general management and strategy roles. Mr. Halford holds a Masters of Business Administration degree from Harvard University and a Bachelor of Science degree from GMI Engineering and Management Institute (now Kettering University).

**Defendant Keizer**

39.     Defendant Keizer has served as a Company director since October 7, 2021 and has served as Chairman of the Board since 2023. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

40.     The 2025 Proxy Statement stated the following about Defendant Keizer:

Mr. Keizer was elected to the Board in October 2021 and became Chairman in May 2023. Mr. Keizer formerly served as Deputy Chairman and Chief Operating Officer of KPMG, the U.S.-based and largest individual member firm of KPMG International ("KPMG"), a role from which he retired in December 2012. KPMGI is a professional services organization that provides audit, tax and advisory services in approximately 150 countries. Mr. Keizer previously held several senior leadership positions throughout his 35 years at KPMG, including Global Head of Audit from 2006 to 2010 and U.S. Vice Chairman of Audit from 2005 to 2010.

Mr. Keizer currently serves as Chairman of the Board of Sealed Air Corporation (NYSE: SEE) and as a trustee and audit committee chair of the Multi-Asset Fund Complex at BlackRock where he provides oversight to approximately 150 registered investment companies within the fund complex. He previously served as Chairman of the Board of Hertz Global Holdings, Inc. (NYSE: HTZ) and The Hertz Corporation from 2015 to 2021; a director and audit committee chair of WABCO Holdings Inc. (NYSE: WBC) from 2015 until it was sold in May 2020; and as a director and audit committee chair of MUFG Americas Holdings, Inc. and MUFG Union Bank, a financial and bank holding company, from 2014 to 2016. Mr. Keizer was also a director of the American Institute of Certified Public Accountants from 2008 to 2011.

Mr. Keizer holds a Bachelor's degree in Accounting, summa cum laude, from Montclair State University, New Jersey.

Mr. Keizer has significant governance, management, operating and leadership skills gained as Deputy Chairman and Chief Operating Officer of KPMG and as a director of multiple public and private companies. In addition, Mr. Keizer, is a certified public accountant, with extensive knowledge and understanding of financial accounting, internal control over financial reporting and auditing standards. Mr. Keizer also has over four decades of diverse industry perspective gained through advising companies engaged in manufacturing, banking, insurance, consumer products, retail, and technology.

### **Defendant Dumas**

41.     Defendant Dumas has served as a Company director since April 3, 2018. Defendant Dumas also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

42.     The 2025 Proxy Statement stated the following about Defendant Dumas:

Mr. Dumas was elected to the Board in April 2018 and served as the Presiding Independent Director from July 2019 to May 2023. Mr. Dumas is the Chair of the Audit Committee of the Company. Mr. Dumas is also a member of the Nominating and Corporate Governance Committee. Mr. Dumas has over thirty years of experience in the lumber, pulp and paper industries. From 1997 until 2017, Mr. Dumas served as the Executive Vice President, Finance and Chief Financial Officer of Tembec, Inc., an integrated forest products manufacturer based in Quebec. Mr. Dumas also served on the board of directors of Tembec, Inc. from January 2011 to February 2017. Mr. Dumas served as a director of Marathon Pulp Inc. from February 2000 to February 2009 and of Jager Building Systems from August 2001 to September 2008. From 1991 to 1997, Mr. Dumas was Vice President, Finance and Chief Financial Officer at Spruce Falls Inc., a newsprint

mill. Prior to joining Spruce Falls Inc., from 1985 to 1991, Mr. Dumas served as Controller at Tembec, Inc. Mr. Dumas received his undergraduate degree in Commerce from the University of Ottawa. Mr. Dumas is qualified to serve on the Board primarily as a result of his extensive finance experience and knowledge of cyclical businesses.

**Defendant Fine**

43.     Defendant Fine has served as a Company director since 2021. Defendant Fine also

serves as the Chair of the Nominating and Corporate Governance Committee and as a member of

the Audit Committee.

44.     The 2025 Proxy Statement stated the following about Defendant Fine:

Ms. Fine was elected to the Board in October 2021. Ms. Fine serves as Chair of Fine Capital Partners, a financial services firm she founded in 2004. She was the Chief Executive Officer of Fine Capital Partners from 2004 to January 2020. Fine Capital Partners manages assets principally for university endowments and foundations. Ms. Fine has over 30 years of investment experience as an equity analyst, portfolio manager, and chief investment officer, with specific domain knowledge of cyclical industries. As an entrepreneur, founder, and Chief Executive Officer of a financial services firm for the past 20 years she is familiar with securities regulation, business development, talent retention, business forecasting, financial oversight, strategic planning, and client management. Ms. Fine is National Association of Corporate Directors (NACD) certified.

Ms. Fine was Director of Global Equities at Loews Corporation, a diversified conglomerate, from 1999 to 2004, where she built an equity investment team, established and managed an internal hedge fund as well as a real estate investment trust portfolio. She began her career as an Investment Banker at Salomon Brothers.

She earned a Bachelor of Arts degree, cum laude, from Yale University and an MBA from Harvard Business School.

Ms. Fine serves on several non-profit boards, including as Vice-Chair of the Board for Save the Children US, an approximately $1 billion international non-profit working in approximately 130 countries to improve the lives of children. She has also served on and/or chaired committees, including Audit and Risk, Finance, Investments, Executive Search and Crisis Management. She is also a Vice Chair of the Board of the Center for Global Development, a think-tank on development policy, where she serves on the Executive, Finance and Nominations and Governance committees.

16

Ms. Fine has deep knowledge of capital markets and financial statement analysis. She also has expertise in evaluating strategic challenges, capital allocation alternatives, effective ways to generate long term value for shareholders and effective shareholder communications. She has decades of experience evaluating senior management teams and the efficacy of their strategic plans and a deep understanding of effective board governance. She is skilled at understanding the key drivers of profitability across various industries with particular domain expertise in all parts of the steel supply chain.

### Defendant Germain

45.     Defendant Germain has served as a Company director since October 7, 2021. He also serves as a member of the Nominating and Corporate Governance Committee and the Human Resources and Compensation Committee.

46.     The 2025 Proxy Statement stated the following about Defendant Germain:

Mr. Germain was elected to the Board in October 2021. Mr. Germain has served as Chief Executive Officer of Constellium SE (NYSE: CSTM), a designer and manufacturer of a broad range of innovative rolled and extruded aluminum products serving primarily the packaging, aerospace and automotive end-markets, since July 2016, and executive director of the board of Constellium since June 2016. Prior to joining Constellium, Mr. Germain was Chief Executive Officer of Algeco Scotsman, a Baltimore-based global business services provider focused on modular space and secure portable storage. Previously, Mr. Germain held numerous leadership positions in the aluminum industry, including senior executive roles in operations, sales and marketing, financial planning and strategy with Pechiney, Alcan, and Novelis. His last position with Novelis from 2008 to 2012 was as President for North American operations. Earlier in his career, he held a number of international positions with Bain & Company and GE Capital. Mr. Germain is a graduate of Ecole Polytechnique in Paris, France and a dual French and American citizen. As Chief Executive Officer of Constellium, Mr. Germain is qualified to serve on the Board primarily as a result of his extensive financial and management experience for a global manufacturer in a complementary industry.

### Defendant Taccone

47.     Defendant Taccone has served as a Company director since 2018. Additionally, Defendant Taccone serves as a member of the Nominating and Corporate Governance Committee and as the Chair of the Human Resources and Compensation Committee.

48.     The 2025 Proxy Statement stated the following about Defendant Taccone:

Mr. Taccone was elected to the Board in April 2018. Mr. Taccone has over 35 years of experience consulting to companies in the global steel industry and companies with interests in the steel industry, including suppliers, customers and investors. Since March 1998, Mr. Taccone has served as a Founding Partner and co-owner of First River LLC, a boutique strategy consulting firm. While at First River, Mr. Taccone has worked with senior management teams, boards of directors, investors and government agencies on challenging and complex issues facing companies in the steel industry, including financial restructurings, capacity rationalizations, mergers and acquisitions, major capital investment decisions, raw material integration strategies, and investments in downstream businesses. Prior to joining First River, Mr. Taccone was a strategy consultant at Beddows & Company, a professional investment management company, from 1988 to 1998. From 1994 until 1998, Mr. Taccone was the North American practice leader and served on Beddows & Company's Board of Directors. Prior to his career as a steel industry consultant, Mr. Taccone worked as a Country Risk Economist from 1985 to 1987 and an Industry Economist from 1987 to 1988 at Mellon Bank, a global financial services company. Mr. Taccone received his undergraduate degree in economics from Washington & Jefferson College and a master's degree in economics from Duke University. Mr. Taccone is qualified to serve on the Board primarily as a result of his deep knowledge of the global steel industry, over 35 years of experience helping steel and related companies to develop and implement effective strategies to achieve profitable growth and significant experience working with senior management teams and boards of directors.

### **The Brookfield Defendants**

49.     During the Relevant Period, The Brookfield Defendants (Defendant BCP Asset Management, Defendant BCP Capital, and Defendant BCP Holdings), were the controlling shareholders of GrafTech. Immediately after the IPO, Defendant Brookfield owned approximately 78% of GrafTech's common stock and thus held majority control of the Company, rendering it a "controlled company" under NYSE rules. During the Relevant Period, The Brookfield Defendants entered into an agreement with GrafTech pursuant to which The Brookfield Defendants was granted the right to appoint the greater of 37.5% or three directors, as well as certain rights and privileges.

### ***Defendant BCP Holdings***

50.     Defendant BCP Holdings is a wholly owned subsidiary of Defendant Brookfield

18

Capital Partners incorporated in New York with a principal business address of C/O Brookfield Capital Partners Ltd., 181 Bay Street, Suite 300, Toronto, Ontario, Canada, M5J2T3.

51.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant BCP Holdings made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 2019 | 30,223,546 | $13.13 | $396,684,041 |
| October 2020 | 1,706,014 | $7.20 | $12,326,529.01 |
| November 2020 | 10,408,931 | $7.61 | $75,061,572.10 |
| December 2020 | 12,538,460 | $9.28 | $112,717,150.38 |
| January 2021 | 20,000,000 | $10.72 | $214,400,000 |
| March 2021 | 30,000,000 | $11.67 | $350,100,000.00 |
| May 2021 | 32,800,000 | $13.17 | $432,856,000.00 |

Thus, in total before the fraud was exposed, Defendant BCP Holdings sold 137,676,951 shares of Company common stock on inside information, for which Defendant BCP Holdings received approximately $1.6 billion in proceeds. Defendant BCP Holdings' insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate Defendant BCP Holdings' motive in facilitating and participating in the scheme.

### Defendant BCP Capital

52.     Defendant BCP Capital is the private equity division of Defendant Brookfield Asset Management and is an Ontario, Canada Corporation with a principal business address of CC/O Brookfield Asset Management Inc., Brookfield Place, 181 Bay Street, Suite, Toronto, Ontario, Canada, M5J2T3.

### Defendant BCP Asset Management

53.     Defendant BCP Asset Management is a global alternative asset management firm

incorporated in British Columbia, Canada, with a principal business address of Brookfield Place, 250 Vessey Street, 15th Floor, New York, NY, 10281-0221. Per the Form 10-K Defendant BCP Asset Management filed with the SEC on March 17, 2023, Defendant BCP Asset Management trades on the NYSE and Toronto Stock Exchange ("TSX") as "BAM".

**Relevant Non-Parties**

54.     This action incorporates information from public documents including the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class action, which itself incorporates statements from former GrafTech employees who offered their experiences as confidential witnesses. The following are the former employees whose statements are referenced throughout this complaint before this court.

*Former Engineering Lead*

55.     The Former Engineering Lead is a former Company Manufacturing Engineering Lead hired by GrafTech in August 2022 to work on the team responsible for restarting the St. Marys Facility. The Former Engineering Lead reported to the Company's Director of Central Engineering and Reliability, Tom Knoll ("Knoll"), who reported directly to Defendant Halford.

**FIDUCIARY DUTIES OF THE DEFENDANTS**

56.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of GrafTech and because of their ability to control the business and corporate affairs of GrafTech, the Individual Defendants and The Brookfield Defendants owed GrafTech and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GrafTech in a fair, just, honest, and equitable manner. The Individual Defendants and The Brookfield Defendants were and are required to act in furtherance of the best interests of GrafTech and its shareholders so as to benefit

all shareholders equally.

57.     Each controlling shareholder, director and officer of the Company owes to GrafTech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of GrafTech, and The Brookfield Defendants as a controlling shareholder, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the controlling shareholders, officers and directors of GrafTech were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Defendant, by virtue of their position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors and officers of GrafTech, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company and The Brookfield Defendants, which was also a controlling shareholder, has been

ratified by the remaining Individual Defendants who collectively comprised a majority of GrafTech's Board at all relevant times.

61.     As controlling shareholders, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

62.     To discharge their duties, the controlling shareholders, officers and directors of GrafTech were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, controlling shareholders, the officers and directors of GrafTech were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio, Delaware, and the United States, and pursuant to GrafTech's own Code of Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

22

(c)     remain informed as to how GrafTech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of GrafTech and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GrafTech's operations would comply with all applicable laws and GrafTech's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to GrafTech and the shareholders the duty of loyalty requiring that each favor GrafTech's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

64.     At all times relevant hereto, the Individual Defendants were the agents of each other and of GrafTech and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, directorial, and controlling positions with GrafTech, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

66.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GrafTech.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of GrafTech was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GrafTech, and was at all times acting within the course and scope of such agency.

**GRAFTECH'S CODE OF CONDUCT AND ETHICS**

72.     GrafTech's Code of Conduct "applies to employees, directors, and officers of GrafTech." The Code of Conduct "is intended to help implement the fundamental principle" that "[e]thical conduct and business success are inseparable."

73.     In the section "ASKING QUESTIONS AND RAISING CONCERNS," under the subheading "Chief Executive Officer and Other Senior Financial Officers," the Code of Conduct

states, in relevant part:

> In addition to their other responsibilities as described elsewhere in this Code, each of the Chief Executive Officer ("CEO"), the Chief Financial Officer and Treasurer ("CFO"), the Controller, and the head of the internal audit function are responsible for:
>
> Acting with honesty and integrity, and avoiding actual or apparent conflicts of interest involving personal and professional relationships, as described in this Code;
>
> Disclosing to the legal department any material transaction or relationship that could reasonably be expected to give rise to such a conflict;
>
> Ensuring that the Company's disclosure controls and procedures function properly and providing other employees of the Company with information that is full, fair, accurate, complete, objective, timely, and understandable for inclusion in filings with the SEC and in other public communications;
>
> Complying with applicable laws, rules and regulations of all U.S. and non-U.S. governmental entities, as well as other private and public regulatory agencies to which the Company is subject; and
>
> Reporting to the legal department any violations of this Code of which he or she is aware.

74.     In the section "CONDUCTING BUSINESS," under the subheading "Fair Dealing," the Code of Conduct provides that "[n]o GrafTech directors, officers, employees, and representatives should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice."

75.     In the same section, under the subheading "Environmental Protection," the Code of Conduct states the following:

> The Company will endeavor to:
> - Conduct its activities responsibly and in a manner designed to prevent accidents and pollution, and to protect the health and safety of our employees, vendors, customers and the public.
>
> - Continually improve and integrate environmental protections into business decisions and planning activities and to design and implement

policies and procedures that provide reasonable assurance that these principles are implemented.

Every employee and representative is required to:

- Conduct business in accordance with all environmental laws, rules, regulations, and corporate commitments.

- Understand the environmental consequences of what we do and look for ways to reduce or eliminate those consequences.

- Follow specified procedures, notify management of potential environmental concerns, and share ideas for continuous improvement.

You should be familiar with your site's policies regarding environmental protection. Employees have a duty to bring any unsafe environmental practices to the attention of management (see Reporting Procedures page 3).

76. In the section "COMPANY INFORMATION, RESOURCES, AND FINANCIAL DISCLOSURE," under the subheading "Complying with Insider Trading Laws," the Code of Conduct states the following, in relevant parts:

All GrafTech directors, officers, employees, and representatives are prohibited from trading in GrafTech securities while in possession of material non-public information. All material non-public information about the Company should be considered confidential information. Confidential information that may be considered material by investors may be disclosed to the public only by a designated officer of the Company (see Public Statements at page 26 for the definition of "designated officer"). Until such disclosure, material information must be held in confidence. . . . .

We must not:
- Disclose any material non-public information to any third party until such information has been broadly released to the public.

- Take any economic or personal advantage of any inside information, such as buying or selling stock or other securities of the Company or of any other company to which the inside information may pertain.

- Use non-public information for personal financial benefit or to "tip" others (including other GrafTech employees and representatives, third parties, or other individuals outside of the Company) who might make an investment decision on the basis of inside information.

Employees and representatives (and outsiders with whom they are associated) who have inside information can lawfully trade in the market once the information is made public through established channels. Directors, officers, and other designated employees who have regular access to inside information may not conduct trading of Company securities during preestablished "blackout periods."

Insider trading is both unethical and illegal, and both the U.S. Securities and Exchange Commission and U.S. Department of Justice investigate and pursue insider trading violations aggressively. For more information on insider trading, see the Insider Trading Policy. If you have questions or concerns regarding your responsibilities under the insider trading laws, contact the legal department.

In the same section, under the subheading titled "Accurate Books, Records, and Financial Disclosure," the Code of Conduct states: To comply with the law as well as maintain credibility with investors, lenders, customers, suppliers, regulators and others, we must consistently prepare financial and other reports accurately and fully and fairly disclose all pertinent information.

To implement these standards, employees and representatives must:

- Seek to ensure that Company financial, accounting and other books, reports and records accurately and fairly reflect the transactions of the Company in reasonable detail and in accordance with the law and the Company's system of internal controls.

- Cooperate with and do not take any action to fraudulently influence, coerce, manipulate or mislead our internal and independent auditors.

- Execute Company transactions only in accordance with management's general or specific authorizations and administrative and accounting controls.

- Never take any action to circumvent the Company's system of internal controls.

- Never authorize payment knowing that any part of the payment will be used for any purpose other than that described in documents supporting the payment. Of course if we incur legitimate expenses in connection with Company business, we will be reimbursed upon the filing of completed and accurately documented expense reports.

- Never destroy, alter or conceal a document with the intent to impede an investigation, or tamper with or destroy a document with the intent to impair its availability in an official proceeding.

- Never establish or maintain unrecorded or "off the books" funds or assets for any purpose.

In addition, each of us must:

- Report only the true and actual number of hours worked.

- Record all Company funds and assets on the books of the Company at all times.

- Retain Company records according to Company record retention policies and procedures.

Also see page 19 for further information on record keeping requirements under the FCPA. Remember, if you wish to raise concerns about accounting or auditing matters on an anonymous basis, call the EthicsPoint Line or submit reports via the Electronic Reporting web link (see Reporting Procedures at page 3).

77.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Dust Emissions Misconduct, the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Additionally, three of the Individual Defendants violated the Code of Conduct by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants breaching their fiduciary duties to the Company by causing the Company to issue false and misleading statements. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## GRAFTECH'S AUDIT COMMITTEE CHARTER

78.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states the purpose of the Audit Committee is, in relevant part:

> The Audit Committee (the "Committee") has been established by the Board of Directors (the "Board") of GrafTech International Ltd. (the "Corporation") to assist the Board in discharging and performing its duties and responsibilities with respect to oversight over the financial affairs of the Corporation and its subsidiaries, affiliates and related parties, including oversight over:
>
> - the accounting and financial reporting processes and systems of internal accounting and financial controls of the Corporation;
>
> - the integrity of financial statements and financial disclosures;
>
> - the quarterly reviews and annual independent audit of the Corporation's financial statements, the engagement of the independent auditor and the annual evaluation of the independent auditor's qualifications, services, performance and independence;
>
> - the capabilities, resources and performance of the Corporation's internal audit function;
>
> - the identification, assessment and management of financial risks and uncertainties, as well as the evaluation of the Corporation's risk and policies for risk management and assessment, artificial intelligence, cybersecurity issues and resolution of any ethics issues;
>
> - compliance with legal and regulatory requirements; and
>
> - the implementation and effectiveness of the Corporation's disclosure controls and procedures.

79.     The Audit Committee Charter, in the section "Responsibilities," under the subheading "Engagement, Oversight and Evaluation of the Independent Auditor," states that it is the Audit Committee's responsibility to:

1. Select (subject to stockholder ratification, if required by the Board), retain, approve the compensation and terms of engagement of, evaluate and assess the performance of and, as appropriate, terminate and replace the independent auditor (and the Committee shall have the sole authority to take any such action). The independent auditor shall report directly to the Committee.

2. Review and approve procedures for the pre-approval of audit and non-audit services by the independent auditor and, as necessary, any audit services on which the independent auditor expressly relies (the "Pre-Approval Policy for Audit and Non-Audit Services").

3. Review and, as appropriate, approve, prior to commencement, all audit services (including comfort letters in connection with securities underwritings and tax services) and all non-audit services to be provided by the independent auditor and, as necessary, any audit services on which the independent auditor expressly relies, in accordance with the Pre-Approval Policy for Audit and Non-Audit Services. The Committee shall give due consideration to whether the independent auditor's performance of non-audit services is legally permissible and compatible with the auditor's independence.

4. Prior to commencement of the annual independent audit, review with management, the internal auditors, and the independent auditors the audit objective and the proposed scope of the audit plan and fees, including the auditor's and management's responsibilities, the areas of business to be examined, the adequacy of the personnel to be assigned to the audit and other factors that may affect the timelines of such audit, any other firms performing audit procedures, the accounting policies and procedures to be followed, special areas to be investigated and the adequacy of the program for integration of the independent and internal audit efforts.

5. On an annual basis, evaluate the qualifications, performance and independence of the independent auditor, including review of the lead partner and taking into account the opinions of management and the head (and any other senior personnel, as appropriate) of internal audit. In connection with this assessment, the Committee shall obtain and review, at least once annually: (i) a report by the independent auditor describing (a) its internal quality control procedures, (b) any material issues raised by the most recent internal quality control review or peer review or by any inquiry or investigation by any governmental or professional authority within the preceding five years, in each case with respect to one or more independent audits carried out by it, (c) any steps taken to deal with any such issues and (d) all relationships with the Corporation, its subsidiaries, affiliates or related parties, and (ii) any other reports, and at such frequency, as required by applicable law or the standards of the Public Company Accounting Oversight Board (United States) (the "PCAOB").

6. Receive and review all reports prepared by the independent auditor and ensure that the independent auditor has full access to the Committee and the Board during its performance of the annual audit to report on any and all appropriate matters.

7. Establish guidelines for the Corporation's hiring of former employees of the independent auditors, which shall meet the requirements of applicable law and the NYSE Rules.

8. Review whether to adopt a policy of rotating the independent auditor on a regular basis or otherwise.

80.     In the same section, under the subheading titled "Financial Statements and Disclosure Matters," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

9. Review with the Chief Executive Officer, the Chief Financial Officer, the head of legal and other applicable senior executives (including members of the Disclosure Committee), the Corporation's disclosure controls and procedures, and review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them.

10. Review, with management and the independent auditor, the Corporation's overall system of internal control, including:

   a. a. management's annual assessment of the adequacy and effectiveness of the Corporation's internal control over financial reporting and the related report issued by the independent auditors;

   b. any significant deficiencies or material weaknesses in the design or operation of the Corporation's internal control over financial reporting;

   c. any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting; and

   d. any changes in the Corporation's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting.

11. Review with the independent auditor:

   a. the Corporation's critical accounting policies and practices;

   b. any significant transactions that are outside the normal course of business or that appear unusual due to their timing, size or nature and

the policies and practice that management used to account for these transactions;

c.  material changes in the Corporation's selection or application of accounting principles, the effects of alternative applications or treatments of accounting principles on the Corporation's financial statements and other public disclosures, and the application or treatment preferred by the independent auditor;

d.  the effect of new or proposed regulatory and accounting initiatives on the Corporation's risks and liabilities, financial statements and other public disclosures and internal controls;

e.  any material written communications between the independent auditor and management, and any difficulties the auditor may have encountered (or is encountering) in the course of its audit work, including any restrictions on the scope of work or access to requested information, and any significant disagreements with management; and

f.  any other matters that are significant to the integrity and oversight of the Corporation's financial reporting process, including any other issues required to be discussed by applicable law, PCAOB Auditing Standard No. 1301 or any other applicable standards of the PCAOB.

12. Prepare annually the Committee's report to stockholders to be included in the annual proxy statement as required by the rules of the SEC.

13. Review and discuss with management and the independent auditor the financial information to be included in the Corporation's Quarterly Reports on Form 10-Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB or applicable law or the NYSE Rules in connection with such filing.

14. Review and discuss with management and the independent auditor the audited financial information to be included in the Corporation's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of the Form 10-K), including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discuss with the independent auditor the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of 6 the PCAOB or applicable law or the NYSE Rules in connection with such filing. Based on such review and discussion, the Committee shall determine whether to recommend to the Board

that the audited financial statements be included in the Corporation's Form 10-K.

15. Review of certain other public releases of financial information, including earnings press releases and earnings guidance provided to analysts and rating agencies (in particular, review of the use of pro forma and other non-generally accepted accounting principles ("GAAP") financial information and off-balance sheet structures).

81. In the same section, under the subheading titled "Oversight of the Corporation's Internal Audit Function," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

16. Review, at least annually, the resources, budget, scope, responsibilities, plans, activities, staffing, organizational structure and quality control procedures of the internal audit function, including the experience and qualifications of the senior members of the internal audit function.

17. Review financial and accounting personnel succession planning within the Corporation, including the appointment, performance and any replacement of the head of internal audit, and make recommendations to the Board regarding the same.

18. Review all audits and reports prepared by the internal audit function together with management's response.

82. In the same section, under the subheading titled "Risk Assessment," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

19. Review and discuss with management, internal audit, the finance department, the legal department and the independent auditor the Corporation's major financial risk and enterprise exposures and the steps management has taken to monitor and control such exposures, including the Corporation's procedures and any related policies with respect to risk assessment and risk management.

20. Review and approve decisions to enter into swaps and other derivative and hedging transactions and review and discuss with management applicable policies governing the Corporation's use of swaps subject to the end-user exception under the Dodd-Frank Wall Street Reform and Consumer Protection Act.

21. Review contingencies that could reasonably be expected to have significant impact on financial performance or condition.

22. Oversee matters related to artificial intelligence, data protection and the security of the Corporation's information technology systems and operations, including programs and defenses against cyber threats.

83.     In the same section, under the subheading titled "Compliance Oversight Responsibilities," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

23. Establish procedures for the receipt, retention and treatment of concerns received by the Corporation regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Corporation of such concerns (the "Whistleblower Policy"). The Committee shall review any such concerns, and shall receive reports regarding the investigation of such concerns, as described in the Whistleblower Policy.

24. Obtain from the head of internal audit and/or the head of legal, no less frequently than quarterly, reports on the Corporation's ethics and compliance program, including confirmation that the 7 Corporation is in conformity with applicable legal requirements and the Code of Conduct and Ethics (the "Code"). The Committee shall periodically, but not less frequently than annually, review with management, including the head of legal, the implementation and effectiveness of the Corporation's compliance and ethics program, including the Whistleblower Policy and the Code.

25. Review, with appropriate members of management, including the head of internal audit, the head of legal and, if appropriate, the independent auditor, any correspondence with regulators or governmental agencies and all employee complaints or published reports that raise material issues regarding the Corporation's financial statements and accounting or auditing matters. The Committee shall also meet periodically, and may request to meet separately, with the head of legal and other appropriate legal staff of the Corporation and, if appropriate, the Corporation's outside counsel, to review any legal matters that may have a material impact on the Corporation's financial statements or the Corporation's compliance policies. The head of legal has express authority to communicate personally with the Committee about any such matters as appropriate.

26. Review with the head of legal, management and the head of internal audit the procedures for monitoring compliance with laws and policies on business integrity, ethics and conflicts of interest, including foreign corrupt practice, antitrust and insider trading matters.

27. Review with the head of legal compliance with applicable laws, including all material regulatory inquiries.

28. In accordance with the Corporation's Related Party Transactions Policy, review and, where required, approve or disapprove the Corporation's Related Party Transactions (as defined in such policy).

29. Review with management compliance with covenants under debt issues and credit facilities.

84.     In the same section, under the subheading titled "Finance," the Audit Committee

Charter states that it is the Audit Committee's responsibility to:

30. Review with management and the independent auditor the Corporation's financial condition, liquidity and funding requirements, including short-term and long-term capital expenditure plans, cash position, capital structure and working capital needs.

31. Review and, as authorized by the Board, approve the amounts, timing, types and terms of public and private stock and debt issues and credit facilities.

32. Review with management financial planning policies and practices and financial objectives.

33. Review reports on expenses of executive officers and directors.

34. Review the actuarial and accounting assumptions used in determining benefit obligations for the Corporation's defined benefit and defined contribution plans and post-employment benefit plans.

35. Review with management the Corporation's effective tax rate, uncertain tax positions, adequacy of tax reserves, status of tax audits and significant tax developments.

85.     In the same section, under the subheading titled "Funding," the Audit Committee

Charter states that it is the Audit Committee's responsibility to:

36. The Committee shall have the authority to determine the appropriate funding (which shall be supplied by the Corporation at the request of the Committee) for the payment of compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation, including the independent auditor; to any Consultants engaged by the Committee; and for the

payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

86.     In violation of the Audit Committee Charter, Defendants Dumas, Fine, and Keizer conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including engagement in the Dust Emissions Misconduct, breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of 10(b) and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

87.     GrafTech manufactures and sells graphite electrode products to a global audience. After initially going public in 1995 as UCAR International Inc., the Company changed its name to GrafTech International Ltd. in 2002. GrafTech's customers are manufacturers of EAF steel and use the Company's electrode products to generate sufficient heat for steel production in place of coal, natural gas, and oil, thus ostensibly offering a more environmentally friendly alternative to traditional steelmaking. GrafTech has frequently emphasized this point to its investors.

88.      For its customers to utilize its graphite electrode products, each such electrode must be affixed with a so-called "connecting pin." Thus, the "pin stock," which the Company machines into connecting pins, is a critical component for GrafTech's manufacturing process.

89.     The Company's graphite electrode manufacturing entails significant

environmental and health concerns because it depends on fossil fuels byproducts, such as needle coke. Specifically, the molding and cutting stage of the process produces significant particulate and other atmospheric pollutants, which fall heavily upon communities near the Company's manufacturing facilities. Mitigation of this significant pollution and its consequent environmental and health impacts requires specialized equipment and containment strategies, including, for example, using specialized dust collectors and procedures to prevent open-air exposure of harmful materials.

90.     The Company owns four manufacturing facilities, located in: (1) Monterrey, Pamplona, Calais, and St. Marys, Pennsylvania. The Company also owns the Seadrift facility in Port Lavaca, Texas where it produces the needle coke the Company uses in its electrode manufacturing.

### *GrafTech's Acquisition and Operational Transformation*

91.     A period of declining demand, falling revenues, and ballooning losses for the Company began in 2011. By the end of 2014, its annual net losses had grown to exceed $285 million, a 1,000% year-over-year increase from a net loss of approximately $27 million in 2013. Amid this slump, GrafTech announced on May 17, 2015, that it had entered into an agreement to be purchased by The Brookfield Defendants.

92.     Pursuant to the Plan of Merger Agreement, Brookfield made a cash tender offer to purchase all of GrafTech's outstanding common stock for $5.05 per share, for a total valuation of $700 million. On August 17, 2015, GrafTech announced the acquisition had been completed, and the company was a wholly owned affiliate of Brookfield. That day, trading of GrafTech's common stock on the NYSE ceased.

93.     Subsequently, over the next three years, the Company underwent an extensive

transformation to return it to profitability, including "warm idling" its St. Marys facility, which had previously been a full-scale production facility capable of manufacturing both graphite electrodes and pins from needle coke, during the second quarter of 2016. "Warm idling" the St. Marys facility would ostensibly allow the Company to restart the facility quickly should it need additional manufacturing capacity, providing the Company with valuable flexibility and variability to better meet peak demand and/or mitigate disruptions in manufacturing.

94.     Following the purported warm idling of its St. Marys Facility, the Company shifted all its graphite electrode manufacturing to its highest capacity and lowest-cost facilities: Monterrey; Pamplona; and Calais. Only the Monterrey Facility could supply connecting pins and pin stock for all the Company's manufacturing facilities. The Monterrey Facility, consequently, had to run uninterrupted for the Company to maintain its business and operational performance.

95.     On April 19, 2018, having ostensibly completed the Company's turnaround, The Brookfield Defendants conducted the Company's Second IPO. The IPO documents lauded the Company's "transformation," and claiming it possessed "the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry." The offering documents further represented GrafTech's facilities as "modern, strategically located and well-maintained," alleging the Company was well-positioned for future growth. Central to this allegedly growth-oriented position, the Company claimed in the offering materials, was the global shift to "more environmentally friendly" EAF steel production.

96.     The Brookfield Defendants sold approximately 35 million shares (approximately 12% of its equity stake) at $15 per share, for gross proceeds of approximately $525 million. Brookfield also sold an additional 3.1 million shares pursuant to a partial exercise of the underwriters' overallotment option for an additional $46 million. None of the proceeds from these

sales went to the Company but instead went to The Brookfield Defendants, who also caused GrafTech to enter into an agreement to pay The Brookfield Defendants a $160 million special cash dividend in connection with the IPO, conditioned upon the Company's financial results, among certain other factors.

**The Dust Emissions Misconduct**

97.     Defendants repeatedly touted the Company's competitive advantages throughout the Relevant Period, telling investors that they had an "on-going commitment to rigorous internal environmental protection standards" and adhered to a strong "environmental management system . . . anchored by policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts." Defendants further claimed that their "sustainability strategy" was executive-led and encompassed emission reduction efforts including "control technology on equipment on all of our sites," and that the Company was being "proactive to improve [its] environmental footprint."

98.     However, these representations were materially false and misleading. The Company's cost leadership had in substantial part been achieved through the failure to implement requisite environmental safeguards at the Monterrey Facility, leaving it open to known material risks regarding government enforcement action and consequent business and operational derailment. The Monterrey Facility had for decades blatantly disregarded applicable local environmental regulation and chronically polluted neighboring communities, resulting in repeated warnings from local authorities. These warnings came to a head in March 2019, when the department of Sustainable Development initiated an administrative proceeding against the Company over the Monterrey Facility's dust emissions.

99.     The Department of Sustainable Development determined that GrafTech's

40

Monterrey facility violated provisions of the Environmental Law of the State of Nuevo León by operating "without the means of control to ensure that dust emissions are avoided," and that the Company had "benefitted economically by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation." The Department of Sustainable Development, in connection with the proceeding's resolution, issued an order including the following language:

> *[I]mmediately and permanently*, [GrafTech] must carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere during the development of the activities carried out in the establishment in question.

100.    The Company subsequently agreed to invest over $2 million in dust collection and containment projects to remedy its violations. In November 2019, Mayor Garza went so far as to celebrate the Company's "renewed commitment" to environmental preservation. This optimism was dashed, however, when the Company shortly resumed its decades-long, established pattern of failing to follow through on commitments to remedy the Monterrey Facility's deficient safeguards.

101.    Consequently, on March 11, 2020, Mayor Garza and Andres M. Canto Ramirez ("Ramirez"), Apodaca's Secretary of Urban Development, Ecology, and Transportation, filed a complaint against GrafTech with the Secretary of Sustainable Development for the Nuevo León State Government. The complaint claimed the Company "constantly and continuously generate[s] emissions of fine graphite and coal dust that is deposited on streets, roofs, floors, garages and the flat parts of houses that are generated by the activities [of the Company]; this affects and decreases both the health of the neighbors and the surrounding environment."

102.    The complaint requested the State of Nuevo León's Attorney General's the "State Attorney General") Office (for Sustainable Development to, among other things, (1) consider the Company's actions as identified in the complaint to be violations of applicable law and human

41

rights; (2) exercise its regulatory authority to initiate proceedings and investigations into the Company's alleged misconduct; and (3) order the total stoppage of the Monterrey Facility. While the subsequent action, if any, taken by the State Attorney General is unclear, the Company continued to do without necessary dust emissions control mechanisms.

103.    Additionally, on September 30, 2021, in light of the Monterrey Facility's continued and unmitigated pollution of nearby communities, an individual filed a citizen's complaint with the Federal Prosecutor's Office for Environmental Protection. Specifically, the citizen's complaint stated with respect to the Monterrey Facility that: "IT'S A COMPANY THAT POLLUTES WITH EMISSIONS OF LARGE AMOUNTS OF GRAPHITE INTO THE ATMOSPHERE, THE PLACE IS DIRTY ALL THE TIME, THE HOUSES FULL OF GRAPHITE. THE COMPANY HAS BEEN AROUND FOR 70 YEARS, THE MAYORS HAVE DONE NOTHING AND NEITHER HAVE STATE GOVERNMENTS. THE INHABITANTS HAVE BECOME ILL." Similar to the previous 2020 complaint filed by Mayor Garza and Mr. Ramirez, it is unclear whether any action was taken in response to this citizen's complaint.

### Defendants Misrepresent the Company's Pin Production Capacity While the Monterrey Facility Faces Administrative Closure for Regulatory Noncompliance

104.    Defendants also misled investors with respect to the Company's supposed efforts to "de[-]risk" its pin production, which was in fact located entirely at the Monterrey Facility, by telling them that the Company was implementing pin production operations at its St. Marys facility. Specifically, during its second quarter 2021 earnings call on August 6, 2021, Defendant Halford told investors that the Company was "investing in a pin production line at [its] St. Marys, Pennsylvania facility that will be online in the third quarter." Defendant Halford represented that this action "diversifie[d] [GrafTech's] pin capability and provide[d] production flexibility."

105.    However, per statements by the Former Engineering Lead, the St. Marys Facility

produced no pins or pin stock whatsoever during 2021 or 2022, and lacked even the proper "operating permits" to perform such activity.  According to the Former Engineering Lead, the cooling pond lacked water and the tools for the press were rusted and covered in dust, making it clear to the Former Engineering Lead that no pin production or manufacturing had taken place within the last year. The Former Engineering Lead further recalled that Defendant Halford, who was ultimately responsible for restarting the facility, regularly visited the St. Marys Facility, and was thus well aware no production was occurring there.

106.    Indeed, the St. Marys facility would not conduct its first "pin trial run" until late 2023. The Former Engineering Lead recalled the St. Marys Facility conducting three trials, but failed to get any pin production operation running before his tenure with the Company ended in April 2024.

### State Officials Order the Closure of the Monterrey Facility

107.    On August 11, 2022, Mayor Garza addressed the Apodaca City Council, stating in relevant part that "[GrafTech] has always had the ability, the skill, to be able to evade the inspection actions that various authorities have attempted to carry out over time. I have witnessed how various attempts have been made over time, none of which have been successfully completed." Mayor Garza continued, stating that "[a]greements were signed, follow-ups were carried out, investments were made, but we have no results. The children in this part of the city are condemned to be taught to crawl on their hands and knees and their little black feet." Mayor Garza also stated that:

> We have access to a report from the Ministry of the Environment, in which *monitoring shows that the emission of carbon particles increases during the night*. That is to say, it allows us to presume *a fraud on the part of the company that knows that the black cloud of coal that they discard at night is less perceptible to citizens who wake up with the dust scattered on their properties, on the porches of their houses, on the cars from our city.*

108. On September 16, 2022, just over a month later, the Company filed a Form 8-K with the SEC (the "September 2022 8-K") that disclosed that the Monterrey Facility had received a temporary suspension notice following a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico. The September 2022 8-K further disclosed that GrafTech Mexico's operating license was "no longer in effect."

### False and Misleading Statements

#### February 8, 2019 Press Release and Earnings Call

109. The Relevant Period begins on February 8, 2019, when the Company issued a press release disclosing its financial results for the fourth quarter and year ended December 31, 2018, and held its corresponding earnings call with investors. During this earnings call, Defendant Rintoul boasted about the purported competitive advantages of the Company while concealing their origin, which in substantial part derived from the Company's failure to implement necessary environmental safeguards at the Monterrey Facility. Specifically, Defendant Rintoul credited "[o]ngoing operational improvements and vertical integration" for giving "GrafTech economies of scale and a competitive cost structure."

110. During this same earnings call, Defendant Rintoul continued to emphasize the St. Marys facility's ability to "support the overall flexibility of [GrafTech's] manufacturing footprint," stating that GrafTech would "ramp up production at St. Marys if required by the market at any point in the future." He further stated at this time that "St. Marys can be thought of as essentially the equivalent of a peaking plant," and that the Company intended to operate it in that fashion.

111. In the question-and-answer portion of the call, Defendant Rintoul further stated

that the Company expected "the degree to which [the Company] run that will move up and down based upon the market dynamics, not unlike that of, again, in the analogy of a peaking plant."

112.    The statements referenced in ¶¶ 109-111 above were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and (2) the St. Marys facility was not producing and was not capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof.

### February 22, 2019 Form 10-K

113.    On February 22, 2019, the company filed a Form 10-K with the SEC for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Rintoul, Coburn, and Dumas.

114.    The 2018 10-K represented that the Company was in compliance with all applicable environmental laws and regulations in its manufacturing process, stating that the Company believed itself to be "currently in compliance in all material respects with the federal, state, local, and foreign environmental laws and regulations to which [the Company is] subject."

115.    The 2018 10-K similarly stated that the Company managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. The 2018 10-K elaborated on this last point, stating that the Company had an "on-going commitment to rigorous internal environmental protection standards," and that accordingly "[e]nvironmental considerations [we]re part of all significant capital expenditure decisions."

116.    Under a heading titled "Competitive strengths," the 2018 10-K highlighted

GrafTech's "lowest cost large-scale" manufacturing plants, including the Monterrey Facility, stating in relevant part:

> We believe our facilities are among the most strategically located and **lowest cost large-scale graphite electrode manufacturing plants in the world.** Of the graphite electrode manufacturing facilities currently operating outside of China, we estimate that our three operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes, making us a critical supplier to global EAF steel manufacturers. **Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors**, and excellent visibility into the large North American and European EAF steelmaking markets.

117.     Elaborating on the Company's specific "cost advantages," the 2018 10-K, with respect to the Company's Monterrey Facility, stated in relevant part that:

> Our manufacturing facilities significantly benefit from their **size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift.** By operating three of the five highest capacity graphite electrode production facilities in the world, we are able to achieve meaningful operating leverage relative to our competitors. **Because of the attractive cost of labor available to our Monterrey facility, we believe we have a significant cost advantage in the production of pins,** which are used to connect and fasten graphite electrodes together in a furnace and are more labor-intensive to produce than other graphite electrodes. Our Calais, Pamplona and **Monterrey facilities have access to low-cost sources of electricity,** a significant element of our manufacturing costs.

> \* \* \*

> Moreover, our Seadrift, Calais, Pamplona, **Monterrey** and St. Marys facilities each provide **unique advantages for us. . . .** We believe our facilities have **significant cost advantages given their scale and access to low cost, reliable energy sources.**

118.     Appended to the 2018 10-K as an exhibit were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Rintoul and Coburn certifying that the 2018 10-K "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information

46

contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of the company.

119.     The statements described in ¶¶ 113-118 were materially false and misleading when made. With respect to the Company's "rigorous internal environmental protection standards" and compliance with "environmental laws and regulations," these statements concealed that the Monterrey Facility had for decades blatantly disregarding local environmental regulations as it chronically contaminated neighboring communities. Furthermore, such statements were misleading insofar as they concealed the fact that the Company had derived significant portions of its cost advantages from these failures to implement necessary environmental safeguards.

### *May 1, 2019 Form 10-Q*

120.     On May 1, 2019, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2019 (the "Q1 2019 10-Q"), which was signed by Defendant Coburn.

121.     The Q1 2019 10-Q disclosed that on March 1, 2019, the Department of Sustainable Development "provided notice of an administrative proceeding with respect of the company's Monterrey Facility," which required the Company to "design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions." The Q1 2019 10-Q represented that the Company was "cooperating" with regulators in connection with the administrative proceeding and reasserted the Defendants' claim that the Company managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

122.     Appended to the Q1 2019 10-Q as an exhibit were SOX certifications signed by Defendants Rintoul and Coburn certifying that the Q1 2019 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information

contained in the [Q1 2019 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

123.    The statements referenced in ¶¶ 120-122 were materially false and misleading when made because they concealed that the Monterrey Facility had for decades blatantly disregarded local environmental regulations and chronically polluted nearby communities with harmful dust emissions.

### July 21, 2019 Form 10-Q

124.    On July 31, 2019, the Company filed a Form 10-Q for the quarter ended June 30, 2019 (the "Q2 2019 10-Q"), which was signed by Defendant Coburn.

125.    The Q2 2019 10-Q substantially repeated the misrepresentations contained in the Q1 2019 10-Q as described above, including its characterization of the status of its ameliorative action at the Monterrey Facility as working to correct "potential violations of state environmental laws relating to emissions." *Supra* ¶¶ 121.

126.    It likewise repeated the Q1 2019 10-Q's representation that the Company was "cooperating with the Department" with respect to the administrative proceeding. *Id*.

127.    The July 2019 10-Q also recapitulated Defendants' claim that the Company managed "[its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements, among other factors."

128.    Appended to the Q2 2019 10-Q as an exhibit were SOX certifications signed by certifying that the Q2 2019 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q2 2019 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

129.    The statements described in ¶¶ 124-128 were materially false and misleading when

made because, *inter alia*, they gave the impression that: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and that (2) the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility.

### November 7, 2019 Form 10-Q

130.    On November 7, 2019, the Company filed a Form 10-Q for the quarter ended September 30, 2019 (the "Q3 2019 10-Q"), which was signed by Defendant Coburn.

131.    The Q3 2019 10-Q reiterated that the Department of Sustainable Development had issued a notice of administrative proceeding regarding the Monterrey Facility, requiring the Company to "design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions." The Q3 2019 10-Q further represented that GrafTech had "cooperated with the Department" with respect thereto, "including payment of certain fines that were not material to the Company." The November 10-Q also reported that, in September 2019, "the Department of Sustainable Development formally closed the proceeding."

132.    Appended to the Q3 2019 10-Q as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q3 2019 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q3 2019 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

### November 7, 2019 Earnings Call

133.    The same day, the Company held an earnings call to discuss the Company's third quarter 2019 results. During this call, Defendant Coburn stated that the Company would "continue

to invest in health, safety and environmental performance."

134.    The statements described in ¶¶ 130-133 were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and (2) they led investors to believe that the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility.

### February 21, 2020 Form 10-K

135.    On February 21, 2020, GrafTech filed on Form 10-K with the SEC its annual report for the year ended December 31, 2019 (the "2019 10-K"), which was signed by Defendants Rintoul, Coburn, Dumas, and Taccone. Therein, the Company represented that it believed itself "currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which [the Company is] subject."

136.    The 2019 10-K also repeated previous claims that the Company managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. Finally, the 2019 10-K also represented that the Company had an "on-going commitment to rigorous internal environmental protection standards" and that "[e]nvironmental considerations [we]re part of all significant capital expenditure decisions."

137.    Under the heading "Competitive strengths," the 2019 10-K emphasized the Company's purported "lowest cost large-scale" manufacturing plants, stating in pertinent part that:

> We believe our facilities are among the most strategically located and lowest cost large-scale graphite electrode manufacturing plants in the world. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately 24% of

estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets. . . . .

* * *

We believe our business has the lowest manufacturing cost structure of all of our major competitors, primarily due to the large scale of our manufacturing facilities.

138.     The 2019 10-K also highlighted the specific "cost advantages" the Monterrey Facility provided the Company, stating in relevant part:

> [O]ur Calais, Pamplona, Monterrey and St. Marys facilities each provide **unique cost advantages** given their scale and access to low cost, reliable energy sources.
>
> * * *
>
> Our manufacturing facilities **significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift**. Our Calais, Pamplona, Monterrey and St. Marys facilities have access to low-cost sources of **electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs.**

139.     Appended to the 2019 10-K as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the 2019 10-K "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of the company.

140.     The statements described in ¶¶ 135-139 were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and (2) the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local

laws and regulations at its Monterrey Facility;

### 2019 Sustainability Report

141.     On September 16, 2020, GrafTech published its inaugural sustainability report (the "2019 Sustainability Report"). It opened with a message from Defendant Rintoul, who described the report as intended to provide stakeholders with a "better understanding of our sharp focus on and plans for continued improvement of [the Company'] ESG programs." The 2019 Sustainability Report similarly stated that its publication constituted an "important step towards demonstrating our commitment to transparency regarding environmental, social, and governance topics."

142.     The 2019 Sustainability Report further stated that:

As a manufacturer of graphite electrodes, we are cognizant of our impacts on the environment. *From energy consumption and air emissions to water use and waste handling, we proactively take steps to reduce these impacts throughout our operations.*

143.     The 2019 Sustainability Report also represented that the Company was proactively working to reduce air emissions and dust around its plants, including at the Monterrey Facility. In relevant part, the 2019 Sustainability Report stated that:

*To reduce emissions, we have installed control technology on our equipment, which limits the amount of air emissions that enter the environment*. In coordination with our sites, our HS&EP and Technology Teams look for and evaluate new and innovative ways to reduce our   missions. Reducing air emissions may come from a variety of activities, including changes and upgrades in processes; upgrading and adding control equipment (dust collectors and SO2 abatement systems); and increased preventative maintenance programs. GrafTech has also focused on *improving the housekeeping around our plants to further reduce dirt and dust. In Monterrey, a new dust collector was installed for our bake process and a new material transport system was installed for moving raw materials from storage to the processing area.*

144.     The 2019 Sustainability Report further highlighted the Company's ostensible attempts to "foster relationships" with the relevant Monterrey governmental authorities:

Over the last year, *we have worked hard to develop and foster relationships with the government and community representatives.* Whether it is upgrading the perimeter of our property, planting trees, sharing our sports complex with the community, or holding open houses to educate people about our business, GrafTech is looking for ways to become a better neighbor.

145.    The statements described in ¶¶ 141-144 above were materially false and misleading when made because, *inter alia*, they distorted the and/or concealed that: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and (2) the Company's pursuit of an environmentally conscious agenda set on legal compliance when in fact the Company had long flouted and continued to flout local laws and regulations at its Monterrey Facility.

### *November 3, 2020 Press Release and Earnings Call*

146.    On November 3, 2020, the Company issued a press release disclosing its financial results for the quarter ended September 30, 2020 (the "November 2020 Press Release"), which was also filed with the SEC as an exhibit to a Form 8-K signed by Defendant Coburn. Among other things, November 2020 Press Release stated that Company's allegedly "advantaged low cost structure" was a "sustainable competitive advantage[]."

147.    That same day, the Company held an earnings call, during which Defendant Rintoul claimed the Company was focused "on being good environmental stewards," was "fully committed" to the efforts described in the 2019 Sustainability Report, and was continuing to "monitor progress on our environmental initiatives." Defendant Rintoul also stated that the Company was "well positioned" because of its "low-cost structure," which he proclaimed a "sustainable and long-term competitive advantage."

### *November 3, 2020 Form 10-Q*

148.    Also on November 3, 2020, the Company filed on Form 10-Q with the SEC a quarterly report for the quarter ended September 30, 2020 (the "November 2020 10-Q"), which was signed by Defendant Coburn, containing statements substantially identical to those in the November 2020 Press Release. *Supra*, ¶ 146. The November 2020 10-Q also repeated prior claims by the Company that it managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

149.    Appended to the Q3 2020 10-Q as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q3 2020 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q3 2020 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

### *November and December 2020 Prospectuses*

150.    On November 10, 2020, the Company filed with the SEC a Prospectus Supplement on Form 424B7 (the "November 2020 Prospectus"). Therein, the Company boasted about its purported "low-cost" manufacturing facilities, in relevant part stating that:

> *We believe that we have the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry,* including three of the highest capacity facilities in the world. We are the only large scale graphite electrode producer that is substantially vertically integrated into petroleum needle coke, a key raw material for graphite electrode manufacturing. *This unique position provides us with competitive advantages in product quality and cost.*

151.    On December 16, 2020, the Company field with the SEC a Prospectus Supplement on Form 424B7 (the "December 2020 Prospectus"). The December 2020 Prospectus contained statements substantially identical to those in the November 2020 Prospectus. *Supra* ¶ 150.

152.    Statements substantially like those detailed in  the November 2020 Prospectus and December 2020 Prospectus were included in prospectus supplements the Company filed on Form

54

424B7 on January 19, 2021, March 3, 2021, and May 26, 2021. *Supra* ¶ 150.

153. The statements identified in ¶¶ 146-153 were materially false and misleading when made, because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and (2) the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility

### *February 5, 2021 Press Release and Earnings Call*

154. On February 5, 2021, the Company issued a press release disclosing its financial results for 2020's fourth quarter and the year ended December 31, 2020, which was also filed with the SEC on February 5, 2021, as an exhibit to a Form 8-K (the "February 2021 Press Release"), which was signed by Defendant Coburn. The February 2021 Press Release quoted Defendant Rintoul as stating that GrafTech's "advantaged low-cost structure" was a "sustainable" competitive advantage.

155. On an earnings call that same day, in addition to again referring to the Company's "advantaged lowest-cost structure" as a "sustainable and long-term competitive advantage," Defendant Rintoul stated that the Company was "centered on improving [its] environmental footprint," continuing:

> *Quinn [Coburn] and I and our senior executives participate in our ESG steering committee. The steering committee oversees our sustainability strategy, which compromises* – or comprises rather, of employee health and safety, community relations, materials sourcing and efficiency, energy management, greenhouse gas emissions, air quality, water and wastewater management and waste management. *The strategy encompasses activities as varied as our community involvement and outreach in Monterrey, Mexico,* our capture of energy generated at our Seadrift Coke facility to create additional sources of electricity for the area and our emission reduction efforts that include the installation of control technology on equipment on all of our sites. *Our goals are centered on improving our environmental*

*footprint across our operations. We are working hard to be good corporate citizens in the communities where we operate.* And every day, our business decisions and actions are guided by our code of conduct and ethics. We look forward to continuing our ESG dialogue with you and publishing our second annual sustainability report later this year.

*February 23, 2021 Form 10-K*

156.    Subsequently, on February 23, 2021, the Company filed on Form 10-K with the SEC its annual report for the year ended December 31, 2020 (the "2020 10-K"), which was signed by Defendants, Coburn, Dumas, and Taccone. The 2020 10-K represented that the Company believed itself "currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which [GrafTech is] subject."

157.    Similarly, the 2020 10-K claimed the Company managed its capital expenditures by accounting for "quality, plant reliability, safety, environmental and regulatory requirements," and other factors. The 2020 10-K also touted the Company's "on-going commitment to rigorous internal environmental protection standards," and that "[e]nvironmental considerations are part of all significant capital expenditure decisions."

158.    Under the heading "Competitive strengths," the 2020 10-K stated:

We believe our facilities are among the most strategically located and *lowest cost, large-scale graphite electrode manufacturing plants in the world.* Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. *Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors,* and excellent visibility into the large North American and European EAF steelmaking markets.

159.    The 2020 10-K also continued to boast of the "cost advantages" GrafTech enjoyed from the Monterrey Facility, stating in relevant part that:

[O]ur Calais, Pamplona, ***Monterrey*** and St. Marys facilities each provides ***unique cost advantages*** given its scale and access to low cost, reliable energy sources.

\* \* \*

Our manufacturing facilities significantly ***benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials***, and our substantial vertical integration with Seadrift. Our Calais, Pamplona, ***Monterrey*** and St Marys facilities have ***access to low-cost sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs.***

160. Appended to the 2020 10-K as exhibits were SOX certifications signed by Defendants Coburn and Rintoul certifying that the 2020 10-K "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of the company.

161. The statements described in ¶¶ 154-160 were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and (2) said statements represented that the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility and was continuing to do so.

### *May 5, 2021 Form 10-Q*

162. On May 5, 2021, the Company filed with the SEC a quarterly report for the quarter ended March 31, 2021 on Form 10-Q (the "Q1 2021 10-Q"), which was signed by Defendant Coburn. The Q1 2021 10-Q described the Company's "low cost structure" as a "sustainable" competitive advantage, and further represented that the Company managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

163.    Appended to the Q1 2021 10-Q as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q1 2021 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q1 2021 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

### May 5, 2021 Earnings Call

164.    That same day, the Company held an earnings call, in connection with which it released a presentation that it referenced throughout said call. The presentation claimed that the Company was being "proactive to improve [its] environmental footprint," including via equipment upgrades. The presentation also included the following graphic:



165.    During the earnings call, Defendant Rintoul claimed this graphic represented the Company's "constant focus" on "safety, environment, [and] quality," and that "SEQ" was a "core mission" of the Company. Defendant Rintoul continued by again highlighting the Company's supposed "low-cost structure" as a "sustainable and long-term competitive advantage."

166.    In prepared remarks during this earnings call, Defendant Halford echoed Defendant Rintoul's claims regarding the Company's supposed focus on environmentalism, stating in relevant part:

> Our ESG efforts fit seamlessly with *our focus on safety, environment and quality, as Dave described. Our ESG Steering Committee, comprised of several members of our executive team, including me, Dave and Quinn, oversees our sustainability strategy.*

167.    The statements described in ¶¶ 162-166 were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; and (2) said statements represented that the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility and continued to do so.

### August 6, 2021 Form 10-Q

168.    On August 6, 2021, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2021 ("Q2 2021 10-Q"), which was signed by Defendant Coburn. The Q2 2021 10-Q touted the Company's "low cost structure" as a "sustainable" competitive advantage. Additionally, the Q2 2021 10-Q stated that GrafTech "manage[d] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

169.    Appended to the Q2 2021 10-Q as exhibits were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q2 2021 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q2 2021 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

### August 6, 2021 Earnings Call

170.    That same day, the Company held an earnings call, during which Defendant Halford stated in relevant part:

***We continue to make good progress with our ESG efforts along several pads***. Notably, in the second quarter, we completed a full materiality assessment with the assistance of external experts to ***identify and prioritize the key ESG issues for our business and our stakeholders***. The process allowed us to objectively determine the ESG topics that will drive our sustainability strategy, reporting and actions moving forward.

171. A presentation used during this earnings call claimed the Company was using "[s]ustainability goal setting to drive performance" on the Company's ESG initiatives, highlighting recent actions the Company had taken at the Monterrey Facility, as shown in the following slide:



172. During this call, Defendant Rintoul once again highlighted the Company's purported "low-cost structure," which he characterized as a "sustainable and long-term competitive advantage."

173. Also during this call, Defendant Halford stated that the Company was "investing in a pin production line at [the Company's] St. Marys, Pennsylvania facility that will be online in the third quarter." Defendant Halford elaborated: "[t]his diversifies our pin capacity and provides production flexibility."

174. The statements discussed in ¶¶ 168-173 were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part

due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; (2) the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (5) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023.

### The 2020 Sustainability Report

175. On September 23, 2021, the Company published its 2020 Sustainability Report (the "2020 Sustainability Report"). The 2020 Sustainability Report included a "message" from Defendant Rintoul, claiming the Company was "committed" to improving its environmental footprint and emphasizing the progress the Company was purportedly making at its Monterrey facility, stating in relevant part:

> As you will read about further in this report, **we are committed to improving our environmental footprint.** We continue **to monitor and track our progress o**n energy consumption and **air emissions to identify opportunities for improvements. During 2020, at our Monterrey, Mexico facility, we continued to implement projects focused on controlling emissions, such as installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operations to enhance our air emission controls.**

176. Under the heading "Environment," the 2020 Sustainability Report claimed the Company had undertaken "extensive work" to better understand its environmental footprint and claimed that it was "committed to the protection of our communities and environment." It further stated that the Company "believes in a strong environmental management system, which is anchored by policies and procedures that allow us to operate in compliance with our regulatory

61

obligations, identify risks, and understand and reduce our environmental impacts."

177.    The 2020 Sustainability Report also featured the Monterrey Facility in a "Spotlight," stating in relevant part:

> At GrafTech, our employees are actively engaged in efforts to improve HS&EP. ***It is not only acknowledged and communicated as a priority, but it is clear in our operations when you visit our sites.*** Our employees in Monterrey, Mexico, are involved in how we translate our health, safety, and environmental commitment into practice.
>
> ***Our Monterrey team continued their work on housekeeping, improving environmental controls and facility upgrades.*** For example, during 2020, we completed construction of a new raw material handling system and improved management of our dust collection systems.

178.    The 2020 Sustainability Report additionally highlighted the Company's various initiatives across its operations, and specifically at the Monterrey Facility, to improve emissions and air quality. In relevant part, it stated:

> ***We have undertaken an initiative to improve critical assets, such as our bake and graphitizing furnaces and emission control equipment,*** with digital controls and predictive alerts, to help identify potential issues and mitigate process interruptions. These enhancements are expected to result in improved process efficiency and reliability in our operations.
>
> ***In Monterrey, we recently invested in automated controls, which maintain temperatures in the bake furnace thermal oxidizers, resulting in more thorough reduction of air emissions from these operations.*** We modified our bake ovens to allow for increased air circulation to reduce accumulation of particulate matter in the ovens. Our team in charge of this project meets on a regular basis to report on progress.

179.    The statements in ¶¶ 175-178 were materially false and misleading when made because, *inter alia*, while these statements represented that GrafTech was actively pursuing an environmentally conscious agenda set on legal compliance, in fact it had long flouted local laws and regulations at its Monterrey Facility and was continuing to do so.

***November 5, 2021 Form 10-Q***

180.    On November 5, 2021, the Company filed a Form 10-Q with the SEC to report its earnings for the quarter ended September 30, 2021 (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendant Coburn and touted GrafTech's "low cost structure" as a purported "sustainable" competitive advantage. Additionally, the Q3 2021 10-Q stated that GrafTech "manage[d] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. Furthermore, the Q3 2021 10-Q stated that "[i]n the third quarter of 2021, [the Company] introduced additional connecting pin production capabilities at our St. Marys, Pennsylvania facility."

181.    Appended to the Q3 2021 10-Q as exhibits were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q3 2021 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q3 2021 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

### The November 5, 2021 Earnings Call

182.    Also on November 5, 2021, the Company held an earnings call during which Defendant Rintoul again described the Company's "low-cost structure," as a "sustainable and long-term competitive advantage." During this earnings call, Defendant Halford told investors that the "pin production line at our St. Marys, Pennsylvania facility is now operational, and we are ramping up production" and that this would provide the Company "with 2 connecting pin production facilities."

183.    The statements referenced in the ¶¶ 180-182 were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws

and regulations at the Monterrey Facility; (2) they represented that the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility and was continuing to do so; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; and (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations.

### February 4, 2022 Press Release

184. On February 4, 2022, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2021, which was also filed with the SEC as an exhibit attached to a Form 8-K signed by Defendant Flanagan (the "February 2022 Press Release"). The February 2022 Press Release quoted Defendant Rintoul regarding the purported "progress" GrafTech had made in its efforts "minimize [GrafTech's] environmental footprint," stating in relevant part:

> We continued to make progress with our ESG efforts including a number of projects throughout our manufacturing plants in an effort to minimize our environmental footprint.

### February 4, 2022 Earnings Call

185. Also on February 4, 2022, the Company held an earnings call during which Defendant Rintoul again highlighted the Company's "low-cost structure" and described it as a "sustainable and long-term competitive advantage." Defendant Halford, meanwhile, emphasized GrafTech's "enhanced reporting" with respect to its sustainability initiatives, and represented that GrafTech had completed "several projects," including improvements at all of its manufacturing plants "to improve air emissions," stating in relevant part as follows:

***We continue to progress on our ESG journey.*** In September, we published our second annual sustainability report, which is available on our website. Our enhanced reporting in this area will not only benefit our stakeholders but will also assist us in identifying projects that will improve our environmental impact.

***We've already completed several projects in this area. For example, in 2021, every electrode manufacturing plant completed at least one capital project to improve air emissions.*** We plan to keep up our momentum in this area and have already identified additional projects for 2022 that will further advance our environmental efforts.

186.    Defendant Halford also told investors:

"Our investment in the ***new automated pin line at St. Marys continues to progress well and helps to de[-]risk our pin production capacity***."

***February 22, 2022 Form 10-K***

187.    On February 22, 2022, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 ("2021 10-K"), which was signed by Defendants Rintoul, Flanagan, Keizer, Dumas, Fine, German, and Taccone. The 2021 10-K stated that GrafTech "manage[d] [its] capital expenditures by taking believe[d] [the Company] operate[d] in compliance in all material respects with applicable laws and regulations into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

188.    The 2021 10-K also represented that the Company had an "on-going commitment to rigorous internal environmental protection standards," and that "[e]nvironmental considerations [were] part of all significant capital expenditure decisions." Under a heading titled "Competitive strengths," the 2021 10-K, stated, in relevant part, that:

We believe our facilities are among the most strategically located ***and lowest cost, large-scale graphite electrode manufacturing plants in the world***. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. ***Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw***

65

*materials and shipping our graphite electrodes to our customers compared to our competitors*, and excellent visibility into the large North American and European EAF steelmaking markets.

189.    The 2021 10-K also boasted the Company's "cost advantages" derived from the

Monterrey Facility, stating in relevant part that:

> [O]ur Calais, Pamplona, Monterrey and St. Marys facilities each provides unique cost advantages given its scale and access to reliable energy sources.
>
> * * *
>
> Our manufacturing facilities *significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift*. Our Calais, Pamplona, *Monterrey* and St Marys facilities *have access to reliable sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs.*

190.    The statements referenced in ¶¶ 184-189, were materially false and misleading

when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in

large part due to the Company's longstanding, blatant disregard of applicable environmental laws

and regulations at the Monterrey Facility; (2) the Company was not actively pursuing an

environmentally conscious agenda set on legal compliance but in fact it had long flouted local laws

and regulations at its Monterrey Facility and continued to do so; (3) the St. Marys Facility was not

producing or capable of producing pin stock, and would require a minimum of 18-24 months to

ramp up production thereof; and (4) because the St. Marys Facility could not produce pin stock,

the Monterrey Facility was the company's sole source of pin stock for all of its operations.

### May 6, 2022 Press Release and Earnings Call

191.    On May 6, 2022, GrafTech issued a press release disclosing the Company's

financial results for the quarter ended March 31, 2022, which it filed with the SEC as an exhibit

attached to a Form 8-K signed by Defendant Flanagan (the "May 2022 Press Release"). The May

2022 Press Release quoted Defendant Rintoul regarding GrafTech's purported commitment to improving its environmental impacts, stating in relevant part:

> We are proud of the continued progress we are making with our sustainability efforts across the organization. These include capital projects **to improve our environmental footprint and the establishment of key environmental goals**, which includes targeting a meaningful reduction in greenhouse gas emissions.

192.    Also on May 6, 2022, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for the quarter. During the call, in addition to Defendant Rintoul again emphasizing the Company's "low-cost structure" as a "sustainable and long-term competitive advantage," defendant Halford again highlighted GrafTech's purported focus on improving its "environmental impact," stating:

> [W]e also continue to make good progress on our own key sustainability initiatives. Most recently, we've established **environmental goals,** which will be highlighted in our next annual sustainability report. These include a commitment for a meaningful reduction in greenhouse gas emissions. To support this objective, **we continue to invest in capital projects that will further improve our environmental impact.**

193.    During this call, Defendant Halford also told investors that the Company's "recent investment in the automated pin line at St. Marys continues to progress and helps to de[-]risk our pin production capacity."

### *May 6, 2022 Form 10-Q*

194.    That same day, the Company filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 (the "Q1 2022 10-Q"), which was signed by Defendant Rintoul and Defendant Flanagan. The Q1 2022 10-Q once again touted the Company's "low cost structure," as a "sustainable" competitive advantage. In addition, the Q1 2022 10-Q stated that GrafTech "manage[d] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

195.    The statements referenced in ¶¶ 191-195 were materially false and misleading when made because, *inter alia*: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; (2) the statements represented that Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility and continued to do so; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; and (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations.

**The Truth Begins to Emerge as False and Misleading Statements Continue**

*The Monterrey Facility's Shutdown*

196.    After the markets closed on September 16, 2022, GrafTech filed a Form 8-K signed by Defendant Flanagan (the "September 2022 Press Release"), disclosing that the Monterrey Facility had received a "temporary suspension notice" ordering the facility to "wind down operations within seven days," following the conclusion of a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico. The September 2022 Press Release further disclosed that "[i]n parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment determined that, among other things, GrafTech Mexico's operating license was no longer in effect." The September 2022 Press Release provided no further details regarding the cause of the temporary suspension notice or the potential financial

impacts of the Monterrey Facility's closure.

197.     On this news, the price of the Company's common stock declined by $0.45 per share, approximately 8.5%, from a closing price of $5.30 per share on September 16, 2022, to close at $4.85 per share the following trading day, September 19, 2022. Because Defendants continued to conceal the full truth regarding the material misrepresentations alleged herein, the price per share of the Company's common stock remained artificially inflated.

198.     The statements referenced in ¶ 196 were materially false and misleading when made because, *inter alia*: (1) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (2) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (3) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023. .

### *November 4, 2022 Form 10-Q*

199.     On November 4, 2022, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("Q3 2022 10-Q"), which was signed by Defendant Kessler and Defendant Flanagan.

200.     Among other things, the Q3 2022 10-Q revealed that the St. Marys Facility's reportedly operational pin production line had not "de[-]risk[ed]" the Company's "pin production capacity" and was not capable of replacing the Monterrey Facility's manufacturing capacity in the near term. Rather, the Q3 2022 10-Q disclosed that the Monterrey facility was "currently [the Company's] only site that produces the pin stock utilized for all [of the Company's graphite] electrodes." The Q3 2022 10-Q continued, in relevant part:

[W]e are pursuing several alternatives with respect to production and sourcing of pin stock as well as other mitigation activities to minimize the impact on our business and our customers if the Monterrey suspension continues for the foreseeable future. These include a potential ***restart of our St. Marys, Pennsylvania facility, where the scope of production is currently limited to graphitizing and machining of electrodes and pins. We are actively pursuing approvals for operating permits for a restart of the facility for pin production.***

201.    Additionally, the Q3 2022 Form 10-Q represented that the financial impact of the closure would only significantly impact the Company's financial results beyond the fourth quarter of 2022 if the Monterrey facility remained suspended, stating in pertinent part:

Beyond the fourth quarter of 2022, ***if Monterrey remains suspended, the impact on the Company's results in the first half of 2023 will be significant***, with sales volume reduced by 50% or more, compared to sales volume in the first half of 2022, before recovering in the back half of the year.

202.    Appended to the Q3 2022 10-Q as an exhibit were SOX certifications signed by Defendants Flanagan and Kessler certifying that the Q3 2022 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q3 2022 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

***November 4, 2022 Earnings Call***

203.    That same day, the Company held an earnings call during which Defendant Kessler reiterated that the Company's business performance would only be significantly impacted by the Monterrey Facility's shutdown if it remained closed – and that, under those circumstances, the impact would be limited to the first half of 2023. Defendant Kessler specifically stated that "unless Monterrey reopens, our business performance will be significantly impacted for the first 2 quarters of 2023 with a reduction in sales volume of 50% or more before recovering in the back half of the year." In response to analyst questions, Defendant Kessler provided assurance that "the impact for Q4 will be modest because we do have quite a bit of existing pin inventory."

204.    On this news, the price of the Company's common stock declined by $0.24 per share, approximately 5%, from a closing price of $4.85 per share on November 3, 2022, to close at $4.61 per share on November 4, 2022. Because Defendants continued to conceal the full truth regarding the material misrepresentations alleged herein, the price per share of the Company's common stock remained artificially inflated.

205.    For example, during the call's question-and-answer stage, Defendant Halford confirmed Defendant Kessler's assessment of the Company's pin stock inventory:

> The substantial majority of the pins that are required to achieve what we're talking about are already in inventory in one form or another. So this is not something that we are going to be dependent on third parties or some other source for achieving the level of achievement that Marcel talked about. **We have a substantial amount of inventory. We have kept a substantial amount of inventory all the way along of pins and pin stock**, and we will be processing that through the other facilities in order to achieve what Marcel was talking about.

206.    During this question-and-answer session, Defendant Halford also engaged with RBC analyst Arun Viswanathan regarding the Monterrey Facility's closure and its impact on contract negotiation for the country:

> [Analyst:] Okay. And then maybe you could just help us understand or get **your perspective on contracting**. Unfortunately, the Monterrey facility is not running full out. So your volumes are going to be down in the first half. And so **maybe that limits the kind of commercial opportunities that you can put forward to your customers, is that true?** And are you kind of now operating more at a kind of shorter time frame, maybe 1 to 3 months of visibility? Or how are you thinking about setting up the next couple of periods of the order book? Is there other options for you in front of you?
>
> [Halford:] Yes, thanks. It's an important question, Arun. And one of the things that I want to make clear is that while we need to consider the near-term supply constraints related to the Monterrey situation, **none of this changes our commercial strategy**. We continue to believe that we are unique in the market in our ability to offer a variety of different contracting terms to our customers, that's supported by our vertical integration, and that's a key differentiator, our ability to provide that certainty to our customers. And while in the very near term, we're dealing with the Monterrey situation, we have absolute confidence in our ability to

resolve this current environment we're in, and it's ***not changing our commercial strategy at all.***

207.    The statements referenced in ¶¶ 205-206 were materially false and misleading when made because they concealed material information known to Defendants regarding the impact of the Monterrey Facility's closure upon the Company's business and financial prospects. Said statements, *inter alia*: (1) misled the public regarding the fact that the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (2)  that because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (3) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023.

### The Monterrey Facility is Allowed to Reopen

208.    On November 18, 2022, the Company issued a press release which it also filed with the SEC as an exhibit to a Form 8-K signed by Defendant Flanagan (the "November 2022 Press Release"). The November 2022 8-K announced that the Company's Monterrey facility was permitted to immediately resume operations pending the Company's "completion of certain agreed upon activities," including the submission of an environmental impact study regarding the Monterrey Facility's operations. The November 2022 Press Release further stated that, for the fourth quarter of 2022, the impact of the Monterrey facility's temporary closure on customer orders would be "consistent with its previous outlook provided on November 4, 2022," but declined to provide any update regarding the estimated impact of the closure with regard to GrafTech's 2023 outlook.

209.    The statements referenced in ¶ 208 were materially false and misleading when

made because, *inter alia*, they failed to disclose that: (1) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (2) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (3) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023.

### *February 3, 2023 Press Release and Earnings Call*

210.    On February 3, 2023, the Company issued a press release disclosing the Company's financial and operational results for the fourth quarter and full year ended December 31, 2022. This press release was also filed with the SEC as an exhibit attached to a Form 8-K signed by Defendant Flanagan (the "February 2023 Press Release"). These disclosures revealed that, despite the Monterrey facility reopening within two weeks of the Company's November 4, 2022 earnings call, the temporary closure had had a significant impact on the Company's fourth quarter performance and was expected to have a significant impact upon the Company's sales volume in the first half of 2023.

211.    During an earnings call that same day, Defendant Kessler elaborated on the extended impact from the Monterrey Facility's closure:

> While we are encouraged to be working towards final resolution of the situation, the negative impact of the suspension on our operating performance in the first half of 2023 will be significant. ***Although production of electrodes and pin stock began immediately upon the [lifting] of the suspension, the required manufacturing time for our products is generally several months. As such, the rebuilding of our pin stock inventory will take time.***
>
> In addition, on the commercial front, ***the timing of the suspension coincides with the critical time frame to secure customer orders for the first half of 2023. As a result of the uncertainty caused by the suspension during this contract***

*negotiation window, our ability to enter into new customer commitments for the first half of 2023 was limited*. As a result, we estimate our sales volume for the first 6 months of this year will be approximately half of the level we reported in 2022 with the largest negative impact materializing in the first quarter of this year.

212. On this news, the price of the Company's common stock declined by $1.01 per share, approximately 15%, from a closing price of $6.59 per share on February 2, 2023, to close at $5.85 per share on February 3, 2023. Because Defendants continued to conceal the full truth regarding the material misrepresentations alleged herein, the price per share of the Company's common stock remained artificially inflated.

213. Defendant Kessler attempted to reassure investors that the negative impact from the Monterrey facility's closure would be limited to the first half of 2023, stating that the Company: "expect[ed its] second half sales volumes to recover as [the Company] move[d] past the Monterrey suspension driven uncertainty . . . ." This statement was materially false and misleading because it concealed Defendants' awareness that the impact of the "contract negotiation window" issue would extend beyond the first half of 2023.

### April 28, 2023 Press Release

214. On April 28, 2023, the Company issued a press release disclosing the Company's financial and operational results for quarter ended March 31, 2023. The Company filed this press release with the SEC as an exhibit attached to a Form 8-K signed by Defendant Flanagan (the "April 2023 Press Release"). The April 2023 Press Release informed investors that "[i]n the second half of the year, [the Company] anticipate[s] sales volumes will further recover, as we move past Monterrey suspension-driven uncertainty . . . ." During an earnings call that same day, Defendant Halford likewise stated that in "the second half of the year, [the Company] anticipate[d] [its] sales volume will further recover as we move past Monterrey suspension driven impact."

215. The statements referenced in ¶¶ 213-214 were materially false and misleading

when made because they continued to conceal Defendants' awareness that the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, persistent negative consequences for the Company's business operations and performance entering 2023.

## THE TRUTH FULLY EMERGES

216.    The truth fully emerged on August 4, 2023, when Defendants reported the Company's results for the second quarter of 2023 and held an earnings call to discuss them. These disclosures reported, among other things, a net loss of $8 million for the quarter, driven by a 49% year-over-year decline in sales as GrafTech continued to "recover" from the Monterrey Facility's shutdown. During the question-and-answer portion of the earnings call, Defendant Kessler labeled the Monterrey Facility closure a "key driver" of the Company's continuing underperformance. Kessler continued:

> . . . In regards to the impact of Monterrey, and I think we've talked about that in some detail on the last 2 calls, right? During that suspension in late 2022, right? *We lost the ability to negotiate volumes, especially for the first half of '23 and maybe even to some extent in the second half*, right? So that was the worst possible time for that suspension. So that is really *the key driver of the impact and underperformance and the disconnect between what you're highlighting here*, the steel utilization rates versus the electro plant utilization rate. I think it's the indirect impact of Monterrey, the loss of that negotiation window during the most critical negotiation time in late 2022.

217.    On this news, the price per share of the Company's common stock plummeted nearly 23%—$1.18 per share—from a closing price of $5.23 per share on August 3, 2023, to close at $4.05 per share on August 4, 2023.

## REPURCHASES DURING THE RELEVANT PERIOD

218.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $400,962,259 to repurchase approximately

34,701,483 shares of its own common stock at artificially inflated prices between August 2019 and June 2022.

219.    According to the Q3 2019 10-Q, between August 1, 2019 and August 31, 2019, the Company repurchased 879,134 shares of its own common stock at an average price per share of approximately $10.79, for a total cost to the Company of approximately $9,485,856.

220.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $5,925,363 for repurchases of its own stock between August 1, 2019 and August 31, 2019.

221.    According to the 2019 10-K, between October 1, 2019 and October 31, 2019, the Company repurchased 125,551 shares of its own common stock at an average price per share of approximately $11.01, for a total cost to the Company of approximately $1,382,317.

222.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $873,835 for repurchases of its own stock between October 1, 2019 and October 31, 2019.

223.    According to the 2019 10-K, between December 1, 2019 and December 31, 2019, the Company repurchased 19,047,619 shares of its own common stock at an average price per share of approximately $13.13, for a total cost to the Company of approximately $249,999,999.

224.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $172,857,142 for repurchases of its own stock between December 1, 2019 and December 31, 2019.

225.    According to the Form 10-Q filed with the SEC on May 6, 2021 (the "Q1 2020 10-Q"), between January 1, 2020 and January 31, 2020, the Company repurchased 104,646 shares of its own common stock at an average price per share of approximately $11.01, for a total cost to

the Company of approximately $1,152,152.

226.     As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $728,336 for repurchases of its own stock between January 1, 2020 and January 31, 2020.

227.     According to the Q1 2020 10-Q, between February 1, 2020 and February 29, 2020, the Company repurchased 1,449,675 shares of its own common stock at an average price per share of approximately $10.80, for a total cost to the Company of approximately $15,656,490.

228.     As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $9,785,306 for repurchases of its own stock between February 1, 2020 and February 29, 2020.

229.     According to the Q1 2020 10-Q, between March 1, 2020 and March 31, 2020, the Company repurchased 1,774,253 shares of its own common stock at an average price per share of approximately $7.49, for a total cost to the Company of approximately $13,289,155.

230.     As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $6,103,430 for repurchases of its own stock between March 1, 2019 and March 31, 2019.

231.     According to the Q3 2021 10-Q, between August 12, 2021 and August 31, 2021, the Company repurchased 1,104,576 shares of its own common stock at an average price per share of approximately $10.75, for a total cost to the Company of approximately $11,874,192.

232.     As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $7,400,659 for repurchases of its own stock between August 1, 2021 and August 31, 2021.

233.     According to the Q3 2021 10-Q, between September 1, 2021 and September 30,

2021, the Company repurchased 3,189,348 shares of its own common stock at an average price per share of approximately $10.77, for a total cost to the Company of approximately $34,349,278.

234.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $21,432,419 for repurchases of its own stock between September 1, 2021 and September 30, 2021.

235.    According to the 2021 10-K, between October 1, 2021 and October 31, 2021, the Company repurchased 364,260 shares of its own common stock at an average price per share of approximately $10.32, for a total cost to the Company of approximately $3,759,163.

236.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $2,283,910 for repurchases of its own stock between October 1, 2021 and October 31, 2021.

237.    According to the Q1 2022 10-Q, between February 1, 2022 and February 28, 2022, the Company repurchased 1,015,036 shares of its own common stock at an average price per share of approximately $9.79, for a total cost to the Company of approximately $9,937,202.

238.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $5,826,307 for repurchases of its own stock between February 1, 2022 and February 28, 2022.

239.    According to the Q1 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company repurchased 2,020,794 shares of its own common stock at an average price per share of approximately $9.93, for a total cost to the Company of approximately $20,066,484.

240.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $11,882,269 for repurchases of its own stock between March 1, 2022 and March 31, 2022.

241. According to the Q2 2022 10-Q, between May 1, 2022 and May 31, 2022, the Company repurchased 3,019,813 shares of its own common stock at an average price per share of approximately $8.28, for a total cost to the Company of approximately $25,004,052.

242. As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $12,773,809 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

243. According to the Q2 2022 10-Q, between June 1, 2022 and June 30, 2022, the Company repurchased 606,778 shares of its own common stock at an average price per share of approximately $8.25, for a total cost to the Company of approximately $5,005,919.

244. As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $2,548,468 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

245. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of 34,701,483 shares of its own common stock by approximately $260,421,253 between August 2019 and June 2022.

## DAMAGES TO GRAFTECH

246. As a direct and proximate result of the Individual Defendants' conduct, GrafTech has lost and expended, and will continue to lose and expend, many millions of dollars.

247. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

248. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against

the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

249.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, including the Dust Emissions Misconduct, and payments of any fines or settlement amounts associated with the Company's violations.

250.    Such losses include the Company's overpayment of approximately $260.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

251.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

252.    As a direct and proximate result of the Individual Defendants' conduct, GrafTech has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## **DERIVATIVE ALLEGATIONS**

253.    Plaintiff brings this action derivatively and for the benefit of GrafTech to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of GrafTech, and The Brookfield Defendants's fiduciary duties as controlling shareholder, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

254.     GrafTech is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

255.     Plaintiff is, and has been at all relevant times, a shareholder of GrafTech.

256.     Plaintiff will adequately and fairly represent the interests of GrafTech in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

257.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

258.     A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, GrafTech's Board consisted of eight directors, Defendants Flanagan, Keizer, Dumas, Fine, Germain, and Taccone (the "Director-Defendants"), along with nonparties Sachin Shivaram and Eric V. Roegner (collectively with the "Director-Defendants," the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was filed.

259.     Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. Furthermore, the Director-Defendants knowingly or recklessly caused the Company to engage in the Dust Emissions Misconduct. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

260.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted GrafTech to issue materially false and misleading statements, and, at the same time, causing the Company to overpay by approximately $260,421,253 for repurchases of its own common stock during the relevant period while the Company's stock price was artificially inflated due to the false and misleading statements and Dust Emissions Misconduct alleged herein.  The fraudulent scheme was, inter alia, intended to obscure GrafTech's noncompliance with local environmental laws and regulations at its Monterrey Facility, its sole producer of pin stock, and the subsequent disruption to its business operations and financial performance in order to make the Company appear more profitable and financially stable to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

261.     Additional reasons that demand on Defendant Flanagan is futile to follow. Defendant Flanagan has served as the Company's CEO since March 26, 2024 and as a director since 2021. Defendant Flanagan previously served the Company from 2021 until November 2023 as its CFO and Senior VP of Finance, as well as the Company's Treasurer, and as the Interim CEO from November 2023 to March 2024. The Company provides Defendant Flanagan with his principal occupation for which he receives lucrative compensation. Thus, as the Company itself admits, Defendant Flanagan is not an independent director. As GrafTech's highest officer, and a trusted Company director, Defendant Flanagan conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements, or its engagement in the Dust Emissions Misconduct, consciously disregarded his duties to monitor such controls over reporting

and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Flanagan is also named as a defendant in the Securities Class Action. Moreover, Defendant Flanagan's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. Defendant Flanagan, was also quoted in multiple public statements, and signed numerous SEC filings containing materially false and/or misleading statements, including, but not limited to, the 2021 10-K, the Q1 2022 10-Q, and the November 2022, 10-Q. For these reasons, too, Defendant Flanagan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

262.    Additional reasons that demand on Defendant Keizer is futile is to follow. Defendant Keizer has served as a Company director since October 7, 2021 and as Chairman of the Board since 2023. Defendant Keizer also serves as a member of the Audit Committee and Nominating and Corporate Governance Committee. As a trusted Company director and Board Chairman, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements, including its engagement in the Dust Emissions Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Keizer signed the false and misleading 2021 10-K. For these reasons, Defendant Keizer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

263.    Additional reasons that demand on Defendant Dumas is futile to follow. Defendant Dumas has served as a Company director since April 3, 2018. Defendant Dumas also serves as the

Chair of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements and its engagement in the Dust Emissions Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Dumas signed the false and misleading 2018, 2019, 2020, and 2021 10-Ks. For these reasons, too, Defendant Dumas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

264. Additional reasons that demand on Defendant Fine is futile to follow. Defendant Fine has served the Board since October 7, 2021, and also serves as a member of the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements and its engagement in the Dust Emissions Misconduct, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Fine also signed the false and misleading 2021 10-K. For these reasons, too, Defendant Fine breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

265. Additional reasons that demand on Defendant Germain to follow. Defendant Germain has served as a Company director since October 7, 2021 and also serves as a member of the Nominating and Corporate Governance Committee, and the Human Resources and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of

the Company's engagement in the schemes to make false and misleading statements and its engagement in the Dust Emissions Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Germain also signed the false and misleading 2021 10-K. For these reasons, too, Defendant Germain breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

266. Additional reasons that demand on Defendant Taccone is futile to follow. Defendant Taccone has served as a Company director since 2018 and is also a member of the Nominating and Corporate Governance Committee and the Chair of the Human Resources and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements and the Dust Emissions Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Taccone also signed the false and misleading 2019, 2020, and 2021 10-Ks. For these reasons, too, Defendant Taccone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

267. Additional reasons that demand on the Board is futile follow.

268. Defendant Dumas, Defendant Fine, and Defendant Keizer, (collectively, the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with

applicable laws and regulations, including those flouted as part of the Dust Emissions Misconduct. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

269.    In violation of the Code of Conduct, the Directors engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, engaging in insider trading, and engaging in the Dust Emissions Misconduct. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Directors breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

270.    GrafTech has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for GrafTech

any part of the damages GrafTech suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

271.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

272.   The acts complained of herein constitute violations of fiduciary duties owed by GrafTech's officers and directors, and these acts are incapable of ratification.

273.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of GrafTech. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of GrafTech, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

274.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause GrafTech to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

275.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

276.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.    The Individual Defendants, by virtue of their positions with GrafTech and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of GrafTech and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause GrafTech to engage in the illegal conduct and practices complained herein.

278.    Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act

279.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

280.    The Individual Defendants participated in a scheme to defraud with the purpose
and effect of defrauding GrafTech. Not only is GrafTech now defending claims that is violated
Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself
is also one of the largest victims of the unlawful scheme perpetrated upon GrafTech by the
Individual Defendants. With the price of its common stock trading at artificially inflated prices
due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to
repurchase approximately 34.7 million shares of its own shares at artificially inflated prices,
damaging GrafTech.

281.    During the Relevant Period, the Individual Defendants also individually and in
concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce
and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify
the Company's press releases, public statements made in earnings calls, and periodic and current
reports filed with the SEC.

282.    The Individual Defendants employed devices, schemes, and artifices to defraud
while in the possession of adverse, material, non-public information and engaged in acts, practices
and a course of conduct that included the making of, or participation in the making of, untrue
and/or misleading statements of material facts and/or omitting to state material facts necessary in
order to make the statements made about GrafTech not misleading.

283.    The Individual Defendants as top executives acted with scienter during the
Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations
and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in
that they failed to ascertain and to disclose the true facts, even though such facts were available to

them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

284.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**THIRD CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

285.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

286.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GrafTech's business and affairs.

287.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

288.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GrafTech.

289.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Dust Emissions Misconduct.

290.    In breach of their fiduciary duties owed to GrafTech, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, inter alia, that: (1) the Company's touted advantaged low cost structure was in large part due to the Company's longstanding, blatant

90

disregard of applicable environmental laws and regulations at the Monterrey Facility; (2) the Company was actively pursuing an environmentally conscious agenda set on legal compliance when in fact it had long flouted local laws and regulations at its Monterrey Facility; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (5) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023.

291.    In further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase more than 34 million shares of its own common stock at artificially inflated prices before the fraud was exposed, while Defendants Rintoul, Flanagan, Halford, and BCP IV Holdings engaged in insider sales of approximately $1.5 billion while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

292.    The yet further breach of their fiduciary duties, Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

293.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

294.    Also, in breach of their fiduciary duties, the Individual Defendants failed to

maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

295.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and to engage in the Dust Emissions Misconduct, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

296.    The Brookfield Defendants, in breach of its fiduciary duties as a controlling shareholder, caused the Company to enter into various agreements favorable to its own financial interests, including two share repurchase agreements shortly before and during the Relevant Period, which required the aggregate repurchase by GrafTech of approximately 31 million shares of its own common stock from The Brookfield Defendants while the Company's stock was trading at artificially inflated prices as a result of Defendants' false and/or misleading statements to the investing public.

297.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

298.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GrafTech has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

299.    Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

300.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

301.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GrafTech.

302.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GrafTech that was tied to the performance or artificially inflated valuation of GrafTech, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

303.    Plaintiff, as a shareholder and representative of GrafTech, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

304.    Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

305.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

306.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence GrafTech, for which they are legally responsible.

307.    As a direct and proximate result of the Individual Defendants' abuse of control,

GrafTech has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

308.    Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

309.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

310.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GrafTech in a manner consistent with the operations of a publicly held corporation.

311.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GrafTech has sustained and will continue to sustain significant damages.

312.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

313.    Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

314.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

315.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors

and business from future customers who no longer trust the Company and its products.

316.     In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

317.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

318.     Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

### EIGHTH CLAIM
**Against Defendants Rintoul, Coburn, Kessler, Flanagan, Halford, BCP Holdings, BCP Capital, and BCP Asset Management  for Contribution Under Sections 10(b) and 21D of the Exchange Act**

319.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

320.     GrafTech and Defendants Rintoul, Coburn, Kessler, Flanagan, Halford, BCP Holdings, BCP Capital, and BCP Asset Management are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Rintoul's, Defendant Coburn's, and Defendant Kessler's, Defendant Flanagan's, Defendant Halford's, Defendant BCP Holdings', Defendant BCP Capital's, and Defendant BCP Asset Management's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

321.     Defendants Rintoul, Coburn, Kessler, Flanagan, Halford, BCP Holdings, BCP Capital, and BCP Asset Management, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained

of herein and in the Securities Class Action.

322.     Accordingly, Defendants Rintoul, Coburn, Kessler, Flanagan, Halford, BCP Holdings, BCP Capital, and BCP Asset Management are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

323.     As such, GrafTech is entitled to receive all appropriate contribution or indemnification from Defendants Rintoul, Coburn, Kessler, Flanagan, Halford, BCP Holdings, BCP Capital, and BCP Asset Management.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of GrafTech, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to GrafTech;

(c)     Determining and awarding to GrafTech the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing GrafTech and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GrafTech and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        2. a provision to permit the shareholders of GrafTech to nominate at least four candidates for election to the Board;

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

        (e)     Awarding GrafTech restitution from the Individual Defendants, and each of them;

        (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 9, 2025

        Respectfully submitted,

        **THE BROWN LAW FIRM, P.C.**

        */s/Timothy Brown*
        Timothy Brown
        767 Third Avenue, Suite 2501

New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

      I, Giulia Carponi, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct. Executed this 05 day of 06 , 2025.

Firmato da:

*Giulia Carponi*

AD5B6F43C6674A7...

Giulia Carponi